STATE

v.

**Charles LAMBERT and Thomas Dooley.**

No. 81–606–C.A.

Supreme Court of Rhode Island.

Aug. 3, 1983.

Dennis J. Roberts II, Atty. Gen., Michael Stone, Sp. Asst. Atty. Gen., for plaintiff.

William F. Reilly, Public Defender, Barbara Hurst, Chief Appellate Asst. Public Defender, Malcolm Najarian, Cranston, for defendants.

## OPINION

KELLEHER, Justice.

During the predawn hours of May 23, 1980, a woman reported to the Providence police the details of how, earlier that same night, she had been accosted in the parking lot of the Marriott Hotel by two armed men, one holding a screwdriver and the other an ice pick. She told police that these men drove her to various locations in the city of Providence and, over the course of forty-five minutes to an hour, robbed and sexually assaulted her, threatening to kill her if she did not comply with their demands. The victim, who for purposes of this opinion will be referred to as Joan, identified the defendants, Charles R. Lambert and Thomas F. Dooley, as the individuals who committed these crimes that night.

Joan testified that her nightmarish experience began at around 11:45 p.m. on May 22, 1980. Earlier that evening a friend had called her and suggested that Joan meet her at the lounge located in the Marriott Hotel. Upon arriving at her destination and successfully finding a parking space, Joan began to get out of her car. As she began to stand up but still had one leg in the car, a man came up to her, put a screwdriver to her throat, and pushed her back into the car, threatening, "Keep quiet. If you make a noise, I'm going to kill you." Joan explained that although she tried to resist, her five-foot-one-inch, 100-pound frame proved no match for the strength of her assailant. As she sat down, she noticed another man sitting in the passenger seat who, while pointing an instrument resembling an ice pick at her, warned her to "[k]eep quiet." The two men then drove out of the parking lot with their unwilling passenger seated between them.

After traveling a short distance to an unknown street on the East Side of Providence, the two men stopped the car and demanded money from Joan. She testified that, out of fear for her life, she handed her billfold over to one of the men. Unsatisfied with the amount of money it contained, the individual in the passenger's seat took her pocketbook to search for more. In total, Joan estimated that approximately $150 was taken from her that night.

Apparently unsure of what to do next with their frightened victim, the two men drove on to a second location near what Joan described as a big, brown building. There, a discussion took place concerning what next should be done. Joan, who is not a native American, was unsure of the exact nature of the ensuing dialogue. In response to the prosecutor's question about what they said they were going to do to her, Joan replied, "They just said they don't know if they should drop me somewhere, or something like that."

Still unsure, the two men left that location and drove a short distance to a parking lot identified by Joan as the one adjacent to the YMCA. They left this area and again proceeded through the streets of Providence. They drove the car a few blocks

past the YMCA, took a left, and ended up in the backyard of a three-family house. There, the man who had been operating the vehicle got out of the car and got into the back seat. Joan testified that this individual, whom she later identified as defendant Dooley, pulled her hair to get her into the back seat. At this point, the passenger said to her, "You better do it, because he's got a bad temper." Again, out of fear for her life and safety, Joan complied with the demands of her abductors. After the driver had forced her to have sexual intercourse with him, the passenger, whom she later identified as defendant Lambert, did the same.

Upon leaving the yard where the assault had occurred, the two men once again began to speak of what they were going to do with their victim. She did not completely understand the conversation but nevertheless implored her abductors to take her back to the Marriott where she would be able to meet her friend. In her pleading with them to let her go, she offered to allow them to keep the car, a 1973 cream-colored Chevrolet with a black vinyl top, belonging to her aunt. After promising not to report the incident to the police, Joan was set free across the street from the Marriott at approximately 12:45 a.m. on May 23, 1980.

Joan did find her friend where expected and soon began relating to her the incidents of the previous hour. Joan agreed to accompany her friend to the latter's home. Once there, they contacted someone at the Rape Crisis Center who advised Joan to go immediately to Women and Infants Hospital. She did so and, after a medical examination there, proceeded to the police station, where an official statement was taken.

During that same night, a police officer on routine patrol noticed a car traveling in the wrong direction on South Main Street shortly after 1 a.m. After a short chase, the car came to a halt, and defendants Lambert and Dooley were extricated from the vehicle. The car they were driving fit the description of the auto Joan relinquished to her abductors in exchange for

her freedom and, in fact, bore the identical license plates. The defendants, who appeared to have been drinking, were taken to the police station where Dooley was charged with drunken driving and Lambert was charged with possession of a prohibited weapon.

Both Lambert and Dooley were placed in a lineup later that morning at Providence police headquarters. After viewing the nine-man lineup for a few minutes, Joan pointed to defendants, Thomas Dooley and Charles Lambert, as the perpetrators of the crime. During trial, she also identified defendants as the men who had assaulted her during the late-night and early-morning hours of May 22 and 23, 1980.

Both defendants were charged with robbery, kidnapping, and first-degree sexual assault. An additional charge of second-degree sexual assault was leveled against Lambert. A Superior Court jury returned guilty verdicts in regard to each count on May 8, 1981, nearly one year after the incident occurred. The trial justice sentenced defendant Dooley to fifteen-year concurrent terms on the robbery and kidnapping counts and to ten years, to be served consecutively, for the crime of first-degree sexual assault. The same sentences were imposed on defendant Lambert, who received an additional three-year term, to be served consecutively, for his conviction of second-degree sexual assault. The defendants are presently before this court claiming numerous errors in the proceedings below.

The first issue defendants raise concerns the trial justice's denial of a motion to suppress the in-court and out-of-court identifications of Lambert and Dooley by the victim. They contend that this evidence was tainted by the suggestive nature of the May 23 lineup, rendering the identification unreliable and therefore inadmissible. The state claims that the lineup was not an unnecessarily suggestive confrontation. Even if some elements of suggestiveness were present, the state argues, in viewing the totality of the circumstances, the identification was sufficiently reliable to counter-

balance any impropriety that may have occurred in the lineup procedure. An examination of the alleged defects in light of the overall circumstances surrounding the identification leads this court to the conclusion that the state's argument is correct and the evidence was properly admitted at trial.

■ A determination of the admissibility of an out-of-court identification requires a two-step examination of the "totality of the circumstances." First, there must be a demonstration that the confrontation was suggestive. If such a finding is made, there must be proof that the impropriety had a high probability of leading to a misidentification. *State v. Porraro,* 121 R.I. 882, 404 A.2d 465 (1979); *State v. Lewis,* 115 R.I. 217, 341 A.2d 744 (1975). Conceivably, an out-of-court identification may be suggestive yet admissible because of the reliability demonstrated by other factors in the case. In *Manson v. Brathwaite,* 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977), the Supreme Court expressly adopted this test for use in cases such as this. The Court rejected the application of a per se exclusionary rule for identifications obtained through the use of unnecessarily suggestive procedures. The Court reasoned that such a rule would serve only to hinder, rather than promote, justice. First, an automatic exclusionary rule withholds from the jury's consideration evidence that is reliable and relevant. Second, although excluding all suggestive-identification evidence would serve to deter police misconduct, it would not do so any better than a rule that excludes only those identifications found to be unreliable. The police will guard against unnecessarily suggestive confrontations for fear that the evidence generated will be deemed unreliable. Third, the exclusion of reliable evidence impedes the administration of justice and may result in the guilty going free. A flexible rule of exclusion based on the competence of the evidence furthers the interests of justice. *Id.* at 112–13, 97 S.Ct. at 2252, 53 L.Ed.2d at 152–53.

For these reasons, an adherence to the rule set forth in *Neil v. Biggers,* 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972), governs the admission of identification evidence in cases such as this. There, the Court set forth several factors that aid in structuring an analysis of the reliability of the identification evidence under the totality-of-the-circumstances test. Before applying these criteria to the facts of this case, we must make a threshold determination of whether the procedure used constitutes a suggestive confrontation.

■ The defendants argue that they were the only individuals in the lineup who fit the description the complaining witness had given to the police. Joan described the driver of the car as a relatively young, heavy-set person, wearing a white T-shirt and jeans. The other individual was described as a skinny man, somewhat older than his companion, garbed in short pants and a T-shirt. A photo depicting the lineup as Joan saw it reveals that, as far as the driver, later identified as Dooley, was concerned, other individuals could have fit Joan's description. At least two other men in the lineup might be classified as heavy-set, one of whom was wearing a light-colored shirt and what appear to be corduroy jeans. In addition, at least one other person is dressed in a white T-shirt and jeans. A much stronger case can be made for defendant Lambert, the passenger, who is pictured as the only man in the lineup wearing short pants. There are, however, other men of similar height and weight as this defendant. Although the suggestiveness of the lineup is not so grave as defendants would have us believe, there are elements that call into question the propriety of this confrontation. Consequently, we shall now consider the reliability of the identification made by Joan.

In *Neil v. Biggers,* 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972), the United States Supreme Court set forth several factors to be considered in deciding whether, under "the totality of the circumstances," a witness's out-of-court identification of an accused was reliable even though the con-

frontation procedure used was suggestive. There the Court stated that

"the factors to be considered in evaluating the likelihood of misidentification include the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation." *Id.* at 199–200, 93 S.Ct. at 382, 34 L.Ed.2d at 411.

A review of the record in this case indicates that each of these factors weighs in favor of the reliability of the evidence. Testimony of the victim reveals that she was alone with her abductors in a car for nearly an hour. She testified that while she was sitting between them in the car, she looked at their faces "quite a bit." Although it was dark at the time, Joan explained that she could see their faces by virtue of the illumination from nearby streetlights. From this testimony, it is apparent that the witness not only had ample opportunity to view defendants at the time of the crime but actually made it a point to do so.

Although Joan's initial description of the criminals which she related to the police was phrased in rather general terms, the details were accurate. Conceivably, many other individuals may have fit the description given by Joan; what is important here, however, is that defendants possessed these characteristics. In addition, any negative inference that may be drawn from the general nature of this description is virtually eliminated by the certainty the victim demonstrated in identifying these two men. According to the detective who accompanied Joan to the viewing, she looked at the lineup for only a short time before pointing to defendants as the men who robbed and assaulted her. Joan testified, "I just can't forget the two men that did it to me. I just, when I saw in the window I just recognize right away." When asked whether she had noticed defendant Lambert's short pants, Joan admitted that she had but that first she "recognized right away his face."

The final factor to be considered is the length of time between the confrontation and the crime. In this case it was a matter of approximately ten hours after the occurrence of the crime that Joan identified her abductors.[1] This factor, combined with the high probability that she had formed a good mental image of the assailants and had little, if any, doubt that they were the guilty parties, leads this court to conclude that any suggestiveness inherent in the lineup was far outweighed by the overall reliability of the surrounding circumstances. The trial justice correctly denied defendants' motion to suppress the identifications made by the complaining witness in this case.

The defendants next cite as error the trial justice's remarks as he concluded his charge to the jury. Just prior to its dismissal to begin deliberations, he cautioned the jury, "Don't be led down the path on something that doesn't concern you. Don't wonder why didn't they bring this evidence in or why didn't they bring that, what about this, what about the breathalyzer? I don't know what the breathalyzer test showed. There was no evidence on it, and we are not going to have that evidence." Counsel for both Lambert and Dooley lodged timely objections to this statement and, on appeal, present several arguments in support of their contention that it was reversible error to so instruct the jury.

The defendants claim that this instruction served to confuse and mislead the jury about the meaning of the term "reasonable doubt." According to their interpretation, the instruction is an incorrect explanation of the concept of proof beyond a reasonable

1. After the attack, Joan was first taken to Women and Infants Hospital. Subsequently, she arrived at police headquarters at 3 a.m. on May 23, 1980. At 8 a.m. she finished giving the police a statement and returned to headquarters at 10 a.m. for a view of the lineup.

doubt. The defense argues that these words, in effect, told the jury not to consider a lack of evidence in reaching their verdict when, in fact, the state's failure to present sufficient evidence to prove its case should result in an acquittal. This especially prejudiced their cases, defendants maintain, since the cornerstone of their defense was the lack of physical and scientific evidence corroborating the victim's story. This instruction eradicated a significant line of their defense.

The defendants find a further flaw in the concluding instruction by virtue of the specific reference made to the breathalyzer-test results. Dooley had told the jury that after he had been taken to police headquarters, he had taken the breathalyzer test. Earlier in his charge, the trial justice properly explained the effect of voluntary intoxication on specific intent and the state's burden to prove lack of extreme intoxication. By later telling the jury to disregard the absence of breathalyzer-test results, the defense argues, the trial justice negated the propriety of the earlier, correct charge.

◼ When reviewing a challenge to a trial justice's instructions to the jury, this court will look to the charge as a whole to determine its correctness. *State v. McKee,* R.I., 442 A.2d 440 (1982); *State v. Howard,* 114 R.I. 731, 339 A.2d 259 (1975). A single sentence will not be taken out of context to show an incorrect statement of law. *State v. Mantia,* 101 R.I. 367, 223 A.2d 843 (1966). The question for determination is how a jury composed of ordinarily intelligent persons would have understood and appreciated the instructions as a whole. *State v. Cipriano,* R.I., 430 A.2d 1258 (1981). In reviewing the questioned language, it must be remembered that the trial justice may charge the jury in his own words as long as he states the applicable law. *State v. D'Alo,* R.I., 435 A.2d 317 (1981).

Before examining the entire charge, we would first point out that the words used by the trial justice are not so prejudicial as defendants would have us believe. In advising the jury to refrain from speculating

why "didn't they bring that, what about this, what about the breathalyzer," the trial justice was reminding the jurors to keep their attention focused on the issues before them and the evidence presented by both parties. In telling the jurors to disregard matters not in evidence, he did not specify which party may have been expected to bring in this unknown material. The use of the word "they" suggests that the caution runs in favor of both parties. A brief evaluation of this language indicates that the trial justice was exercising his prerogative to instruct the jury in his own words. *See State v. D'Alo, supra.* It must now be determined whether that instruction constitutes an incorrect statement of law in the context of the entire charge.

◼ As previously stated, the trial justice spoke these criticized words at the very end of his charge. He had already delivered detailed instructions on the law, including a lengthy explanation of reasonable doubt. This court has held that when a jury is given reasonably clear and correct burden-of-proof instructions, the mere addition of a further instruction on the same subject is not necessarily erroneous. *State v. Deans,* 93 R.I. 266, 174 A.2d 666 (1961). The instruction will be struck down only if it mandates a shifting of the burden of proof. *Id.* at 271, 174 A.2d at 668. Although the present case deals with the degree of proof instead of the party charged with the burden of proof, a similar criterion may be applied. As long as the reasonable-doubt standard was not lessened by the concluding instruction, it need not be rejected. The answer to this question depends upon the adequacy of the charge. If a complete, accurate definition of reasonable doubt was previously given, the language complained of will be allowed to stand.

◼ The trial justice instructed the jury that reasonable doubt is a "sound, sensible, logical doubt based on the evidence." The defendants claim that by excluding the words "lack of evidence" in explaining the means by which reasonable doubt may

arise, the trial justice delivered incomplete instructions on this topic to the jury. Although this court favors the use of those words in defining reasonable doubt, *State v. Thorpe,* R.I., 429 A.2d 785, 790 (1981) (instruction by trial justice that reasonable doubt is "based on evidence or lack of evidence" conveys the essence of the term "reasonable doubt"), we are not about to fault the trial justice even though it might be appropriate to inform the jury that a lack of evidence may give rise to a reasonable doubt. We would therefore agree with the reasoning of the court in *State v. Henderson,* 362 So.2d 1358 (La.1978). In that case, the defendant claimed error in the trial court's failure to use the statutory language prescribed in 2A La.Code Crim. Proc. art. 804A(2) (West 1981), which states:

"In all cases the court shall charge the jury that: * * * (2) It is the duty of the jury * * * to give the defendant the benefit of every reasonable doubt arising out of the evidence or out of the lack of evidence in the case."

Although stating a preference for the statutory language, the court upheld the charge as given since it substantially complied with the legislative intent of the statute.[2]

Throughout his charge the trial justice emphasized that it was the state's burden to introduce enough evidence to prove defendants' guilt beyond a reasonable doubt. While discussing the presumption of innocence, the trial justice cautioned the jury that the presumption "remains with the defendant until the time comes, if it comes at all, when the members of the jury are unanimously satisfied that the state has introduced enough evidence on a particular count to prove the defendant guilty beyond a reasonable doubt. If that time * * * never come[s], then the presumption of innocence alone is enough to require the jury to say not guilty." In enumerating the elements of the crimes of robbery, rape, and kidnapping, the trial justice often referred

to the state's burden to prove each element beyond a reasonable doubt. The instruction on voluntary intoxication expressly warned the jury that the state has the responsibility to prove lack of extreme intoxication. Finally, within the reasonable-doubt instruction itself, the trial justice reiterated the necessity for the state to produce enough evidence to convince the jurors of defendants' guilt to a moral certainty. He stated:

"It is not sufficient for the State to establish a probability, even though a strong one, that the defendant is guilty. The evidence must establish his guilt to a moral certainty."

The cumulative impact of these instructions would instill in a juror of ordinary intelligence the gravity of the state's burden of proof. Without using the exact words advocated by defendants, it is clear that the trial justice conveyed to the jury the concept that a lack of evidence may give rise to a reasonable doubt. His concluding sentences did not erase the jurors' understanding of the previous correct instructions regarding the meaning of reasonable doubt and the effect of intoxication on specific intent. When the charge is considered in its entirety, defendants' claim of error must be rejected.

■ The final facet of defendants' appeal concerns the kidnapping counts. In charging the jury, the trial justice defined kidnapping as the "willful and unlawful seizing of a person against his or her will and transporting that person any distance at all with the intent to cause that person to be confined or detained." By defining kidnapping in these terms, the trial justice refused a defense request that he instruct the jury that there could be no conviction returned on the kidnapping count if the jury determined that the kidnapping was merely incidental to committing another offense, such as sexual assault.

The trial justice charged the jury on May 8, 1981. Two months later this court in

---

**2.** The court warned, however, that failure to instruct in accordance with the exact statutory form could result in reversible error in future cases. In *State v. Mack,* 403 So.2d 8 (La.1981), this threat was carried out.

*State v. Innis,* R.I., 433 A.2d 646 (1981), ruled that in order to come within the reach of our kidnapping statute, G.L. 1956 (1981 Reenactment) § 11–26–1, any confinement or imprisonment must have some independent significance, and thus any movement of a victim during the course of a crime cannot be punished as kidnapping unless such movement exceeds that necessary to facilitate the crime at hand. The defendants rely on the approach taken in the *Innis* case and argue that the evidence adduced at trial was totally insufficient to support the kidnapping count.

Nobody is blessed with 20/20 foresight, and at the time he was called upon to construe the statute the trial justice did not have the benefit of the precedent-setting holding of *Innis. State v. Ballard,* R.I., 439 A.2d 1375 (1982). There was and is ample authority to support the view that any seizure or detention of a victim with any accompanying movement is sufficient to constitute a separate crime of kidnapping. Annot., 43 A.L.R.3d 699, § 3 (1972). The trial justice was instructing the jury on the law as it existed in several jurisdictions at that time. We shall apply the rule in *Innis* prospectively to those cases tried thirty or more days after July 29, 1981, the date on which *Innis* was published.

However, the facts adduced at trial and the actions of the defendants on the night in question would amply justify a guilty verdict under the rule set forth in *Innis.* After forcing the victim back into her car, the defendants drove her to an East Side location where they proceeded to rob her. Joan testified at trial that after leaving that locale she was taken to various other sections of the city by these men and at one of these grim sites was sexually assaulted by them. She was in their unwelcome company for nearly an hour during which time the defendants discussed what they should do with her, whether they should "drop" her somewhere. Her ultimate release was attained only after she promised that she would not notify the police and after she told the defendants that they could keep her car. The confinement lasted longer than necessary, and the movement exceeded that necessary to facilitate the crimes of robbery and sexual assault. The independent significance of Joan's confinement is further proved by the uncertainty of Lambert and Dooley about what they should do with their unwilling passenger. It is our conclusion that even if the *Innis* charge had been given, there was ample competent evidence which would justify the trial justice's denial of the defendants' new-trial motion.

The defendants' appeals are denied and dismissed. The judgments appealed from are affirmed, and the case is remanded to the Superior Court.