STATE

v.

Sydney Earl Scott TAYLOR.

No. 88–180–C.A.

Supreme Court of Rhode Island.

July 17, 1989.

**446**

James E. O'Neil, Atty. Gen., Jane M. McSoley, and Jeffrey J. Greer, Asst. Attys. Gen., Providence, for plaintiff.

Richard Casparian, Public Defender, Catherine A. Gibran, and Barbara Hurst, Asst. Public Defenders, for defendant.

## OPINION

MURRAY, Justice.

A Superior Court jury found Sydney Taylor guilty of one count each of burglary, in violation of G.L. 1956 (1981 Reenactment) §, 11–8–1; kidnapping, in violation of G.L. 1956 (1981 Reenactment) § 11–26–1; first degree child molestation sexual assault, in violation of G.L. 1956 (1981 Reenactment) §§ 11–37–8.1 and 11–37–8.2, as enacted by P.L. 1984, ch. 59, § 2; and obstructing a police officer in violation of G.L. 1956 (1981 Reenactment) § 11–32–1. The jury acquitted defendant of breaking and entering, in violation of G.L. 1956 (1981 Reenactment) § 11–8–2, as amended by P.L. 1985, ch. 426, § 1. The defendant appeals his conviction. We affirm.

In the early morning hours of July 19, 1985, Susan Traylor was asleep in her second floor apartment at 70 Corinth Street in Providence, Rhode Island. She awoke to hear the dog barking loudly and constantly. She went to the window that overlooked her backyard to tell the dog to quiet down. Approximately fifty feet below her in the back yard, Traylor saw a black man running towards the back fence. The man was shirtless, carrying a white bundle, and had very short hair. When he reached the fence, the man threw the bundle over and climbed the fence. Once over, he grabbed the bundle and continued running until he reached another fence about three feet high. The man leaped over this fence, and ran into another yard. At this point Traylor could no longer see him. She woke her boyfriend and told him that things were being stolen in the backyard. Traylor then went downstairs to the front porch where she met her first-floor neighbor, Lydia Gray.

Lydia Gray lived in the first-floor apartment below Traylor's. Her address was 68 Corinth Street, where she lived with her boyfriend and her six children. Upon meeting Traylor on the front porch, Gray told Traylor that the sound of an intruder had woken her. She and her boyfriend had gotten up, but by then the person was gone and nothing appeared to be missing from their apartment. Traylor responded that the man must have grabbed something because he had something in his bundle and she saw him throw it over the fence and then carry it with him. At this time a police car was stopped farther up Corinth Street, and a policeman there was talking to several people. Gray motioned to the policeman that she wanted to speak to him, and then went back into her house. One of Gray's children asked Gray where her daughter Sally was. Gray responded indignantly "[w]hat do you mean 'where is [Sally]?' She's in her bed." Sally, however, was not in her bed and was no where to be found in the apartment. Upon discovering Sally missing, everyone ran outside calling her name. Gray became hysterical. (The victim's and her mother's names have been changed.) In response to the commotion, some of the neighbors came outside and gathered in front of 68 Corinth Street.

Later, after Sally's return, the following account of her abduction was revealed. Sally was seven years old at the time of the attack. She had gone to bed the evening before in her home, but as she woke up she became aware that a man was carrying her. Sally couldn't see anything, however, because she had a blanket over her head. The man carried Sally outside, and then she felt him throw her over a fence. At that point the blanket came off and Sally recounted that she saw a big black man, who was thin, shirtless, and wearing jeans. The man picked her up and carried her. It was dark out and Sally was scared. The man slapped Sally and told her that if she screamed he would kill her. The man kissed Sally, and she said when he did so she saw his face. He pulled his jeans and undershorts down and made Sally feel "his thing" with her hand. (At trial when Sally was asked what "his thing" was, Sally testified that it was what a boy goes "pee-pee" with.) He ordered Sally to "suck his thing." Sally obeyed. The man also took off Sally's underwear. The man then climbed up a tree, and Sally ran home. When Sally got home, her mother, the neighbors, her siblings, and the police were in the front yard.

Five members of the Providence police department testified at trial. These officers were Carl Weston, Jr., Mary Day, Michael Moise, Jr., Stephen Balestra, and Robert Turchetti. Each made an in-court identification of defendant. Carl Weston testified that on July 19, 1985, he was on patrol on the south side of Providence when at approximately 4:45 a.m. he was flagged down by some persons on Corinth Street who reported that a man had tried to break into their house. They gave Weston a description of the man as a slim black male, shirtless, barefoot, and wearing blue jeans. Weston broadcast on the police radio that there was a breaking and entering in progress, and the description of the suspected perpetrator. Lydia Gray approached Weston and told him that her

daughter had been taken. Weston then broadcast the possible kidnapping.

At this time, Officers Mary Day and Michael Moise were on patrol together. In response to the report of a break in progress and a possible abduction, they drove to 68 Corinth Street. In front of the building was a crowd of people. Soon a little black child came running down the street. The officers described Sally as hysterical, crying, dirty, and her nightgown torn. Sally and her mother ran to each other and embraced. When Sally was asked to describe her assailant, she said he was a black man, skinny, no shirt, and wearing jeans. Sally said he was in the area one street over. Day and Moise got into their police car and went to that area. At approximately 5 a.m., another announcement came over the radio stating that a person fitting the description had been sighted near Broad and Colfax. Day and Moise proceeded to this area. There they heard a dog barking ferociously. They got out of their car and walked toward the backyard of the house where the dog was located. Officer Day recounted that fifty feet in front of her toward the back of the yard, she saw a black man standing on top of a fence and holding onto the branch of a tree. He had his back to Day, and was shirtless and wearing jeans. When Moise testified, his recollection was that the man was in the tree. In any case, Day then yelled to the man, "[h]old it! Police!" at which point the man jumped over the fence into the vacant lot. Day ran to the fence, climbed over, and pursued the man into the vacant lot. Moise returned to the car, and broadcast the sighting.

One policeman described the fenced vacant lot as a junkyard. It had trees, bushes, approximately three-feet-high grass, trash bags, beer bottles, cans, tires, and rubble. Once in the lot, Day could no longer see the suspect. It was still dark and she started searching the brush. Day saw her police lieutenant over on the sidewalk and told him that she had chased the subject into the lot. The lieutenant replied that no one had come out. By this time Officers Moise and Robert Balestra had arrived and also had entered the lot. Ba-

lestra searched using his flashlight, and spotted the man lying underneath a tree. The man had buried himself under leaves, a tree limb, and a piece of sheet metal. His feet, however, were sticking out. Balestra called out to the other officers, and grabbed the man's foot. The man leaped up, and pushed everything he had covering him onto Balestra. A violent struggle ensued between the man, Balestra, Day, and Moise. Officers Weston and Turchetti had arrived and witnessed the struggle. The police officers subdued defendant and put handcuffs on him.

The police lieutenant at the scene instructed Turchetti to put defendant in the back of Turchetti's police car and transport him to 68 Corinth Street for possible identification. Turchetti did as instructed and at trial testified that at this point it was approximately 5:05 a.m. When he pulled up at Corinth Street, Turchetti parked directly in front of the building, opened the driver's door and left it open, and got out of the police car. Sally and her mother were on the front porch. He stayed near the car and called to Gray to bring Sally over. Sally and her mother approached the car. At trial Turchetti testified that he said he wanted Sally to tell him if she had seen defendant before. Other witnesses recalled Turchetti as phrasing the question "is this the guy?" Turchetti then opened the back door of the police car because the windows don't roll down and he wanted Sally to get a good look. The inside car light was on. As soon as the door was open, Sally yelled "[t]hat's him!" At this point there were roughly fifteen to twenty neighbors present. Some of them were armed with such things as an axe and a baseball bat. For the suspect's safety, Turchetti left Corinth Street and took defendant to the central police station.

During the time the suspect was in custody in front of 68 Corinth Street, one of the neighbors told a policeman that the man in the backseat of the police car had entered the neighbor's house earlier that morning. As yet, the neighbor had not reported the episode. The neighbor was Manuel Duran, Jr., who lived with his

brother in the first-floor apartment at 60 Corinth Street. Earlier that morning, Duran had awakened to the sound of footsteps in his apartment. He thought his brother was making this noise. Duran was lying in bed on his back, and he felt someone touch the mattress. He opened his eyes to see a face six inches in front of his own. Duran screamed. He tried to grab the man around the neck and shoulders, but the intruder kept slipping Duran's grip. Duran followed the intruder into the living room, where he dove headlong out the living-room window. The window was open and without a screen. As the man was escaping through the window, Duran saw that the man was dark-skinned, shirtless, thin, wearing jeans, and had very short hair.

By this time, Duran's brother was up and the landlord from upstairs came down to inquire why Duran had screamed. They checked the apartment and nothing was missing. Duran decided not to report the incident to the police and went back to bed. Approximately fifteen minutes later, Duran heard the commotion surrounding Sally's disappearance. He was in front of Sally's home when the police arrived with defendant in the back of the police car. Duran testified that that morning, he was certain the person in the police car was the same man he had seen earlier that same morning over him in his bedroom. Upon recognizing defendant, Duran decided to report the incident to the police. (At trial, however, Duran stated that he could no longer recognize the person who had entered his bedroom, and therefore he could not state whether defendant was the man who had entered his home.) He also testified that he did not remember whether the evening before he had closed the window.

After Sally had identified defendant, she was taken to the hospital and the police station. The police requested that Susan Traylor attempt to have Sally take her to the spot where the assault had occurred. Sally showed Traylor a place in front of the garage at 53 Corinth Street. There they found Sally's underwear. Traylor informed the police that Sally had led her to the scene of the crime, and a person from

the crime laboratory came. Traylor took him to the place Sally had indicated, and he picked up the underwear with tongs and put it in a bag.

The defense presented only two witnesses, defendant Sydney Taylor and his father, Albert Taylor. The defendant testified that on the evening of July 18, 1985, he was residing with his father in Providence. He testified that on the evening in question he went out to a club with a group of people. Included in the group were Taylor's wife and father. He said they returned home in the early morning hours of July 19, 1985, at which time Taylor and his father spent about half an hour sitting on the porch. The defendant testified that his father then went to bed. The defendant said he had seen the police driving around, and left the porch to walk up the street to see what was happening. Taylor testified that he was wearing jeans, a green T-shirt, and black shoes. He said he went up the street and then stopped to ask some people what was going on. Taylor testified that the police then came down the street, and six policemen grabbed him and started beating him up and tearing off his shirt. The police then handcuffed Taylor and placed him in a police vehicle. The defendant denied that he had kidnapped and assaulted Sally. The defendant's father, Albert Taylor, testified that he had been out with defendant on the evening in question, and that after returning home with defendant, the two of them sat on the porch. Albert Taylor testified that he went to bed before defendant left the porch to walk up the street.

A voir dire hearing was held to determine Sally's competency as a witness. At the time of the hearing, Sally was nine years old. When asked if she knew the difference between a lie and the truth, Sally said she did. She stated that a lie was when you make something up, and the truth is when you say what really happened. At the voir dire, the assistant attorney general was wearing a white shirt. He asked Sally:

"Q. [I]f I tell you * * * the shirt I am wearing is red, is that the truth or a lie?
"A. A fib.

"Q. If I tell you that this shirt is white, what is that?

"A. Truth."

She defined what an oath was saying that it meant you promised to tell the truth. When asked what happens when you tell a lie, Sally replied that you get in trouble with your mother and the judge. The judge found Sally competent to testify.

The next pretrial issue to be considered was whether Sally would be allowed to testify at trial via videotape. On June 19, 1986, a hearing had been held on defendant's motion to suppress Sally's prior identification. The defendant was present at the hearing. Once Sally was on the witness stand, she froze with fear and was unable to communicate. The trial judge declared Sally incompetent to testify. The state then filed a motion to take and to present Sally's testimony on videotape under G.L. 1956 (1981 Reenactment) § 11–37–13.2, as enacted by P.L. 1985, ch. 355, § 1. (The text of the statute is set forth in the appendix.) The trial judge ruled that the state would have to make a showing that Sally would suffer unreasonable and unnecessary mental or emotional harm to invoke the statute, and that such a showing might be made by having the child undergo psychological evaluation. Both the state's expert and the defense's expert performed a psychological examination of Sally. A hearing was held to determine the results of these evaluations.

At the hearing to determine whether Sally would suffer unreasonable and unnecessary mental or emotional harm, the state presented Dr. Barry Nurcombe, M.D., who was qualified as an expert in adult psychiatry, child psychiatry, and forensic psychiatry. Nurcombe opined to a reasonable medical certainty that Sally would suffer unnecessary and unreasonable emotional distress and potential harm from testifying in the presence of defendant.

Nurcombe interviewed Sally on three separate occasions, each time for approximately one hour. Before interviewing Sally, Nurcombe testified that he had discussed the background of the case with an attorney from the Attorney General's office and reviewed documents such as witness statements. He also conducted an hour-and-a-half interview with Sally's mother, and a half-hour telephone interview with Sally's teacher. Nurcombe stated he had learned that Sally was very anxious for three weeks after the abduction. She was fearful of being separated from her mother, insisted that the doors and windows to her house be locked, and could only use the bathroom if her mother accompanied her. Sally did not want to go to school where other children taunted her by saying she had been raped. After three weeks these acute symptoms subsided, but Sally continued to have nightmares and a decreased appetite. In June of 1986 Sally appeared in court where defendant was present and she was unable to testify. After the court appearance, Sally said to her mother that even if defendant got twenty years in prison, Sally would be twenty-eight when he got out and defendant would still be young enough to kill her. Sally's mother told Nurcombe that Sally had stated "[h]e is going to kill me. He is going to get me." During his interviews with Sally, Nurcombe described Sally as generally quite friendly and open, but when he brought up the kidnapping, Sally became very tense and virtually silent. Nurcombe explained to Sally that he needed to find out if Sally would be able to testify in court if the man who attacked her was there. At this point Sally became silent, sucked her thumb, and would answer questions only by nodding or shaking her head. When Nurcombe posed the question "[a]re you still afraid that he might hurt you?" Sally nodded and began to cry. Nurcombe stated that Sally was still afraid of being separated from her mother, afraid to be alone, and afraid to have the doors and windows unlocked. Although Sally did meet with a defense psychiatrist, his or her testimony was not presented at trial. The trial judge found that the state had met its burden and that Sally unequivocally would suffer unreasonable and unnecessary mental and emotional harm if required to testify in defendant's presence.

In regard to the technical aspects of the videotaping, the state presented Roland

Rudio. Rudio was an experienced videomaker and an employee of Vitech, a company which produces videos. Rudio stated that the videotape would make an accurate audio-visual reproduction of Sally's testimony, and that the voices of persons would be identified on the tape by the person stating his or her name before speaking. Rudio testified that he would deliver the tapes to the court immediately after they were made in order for the court to play them back and be satisfied that the video produced was an accurate reproduction of Sally's testimony. When the tape was made on February 10, 1987, present in one room were: the judge, Sally, Sally's mother, defense counsel, the prosecutor, and the stenographer. As a stationary camera was pointed at Sally sitting in a chair, it was unnecessary to have a technician present to operate the camera. The defendant was in an adjacent room and was able to view and hear Sally's testimony on a color monitor as it was recorded. The defendant and defense counsel wore headsets that allowed them to talk to and hear each other at all times. After the videotape was made, the judge, defense counsel, and the prosecuting attorney all viewed the tape and agreed that it was an accurate recording. At trial, the videotape of Sally testifying was admitted in lieu of her live testimony.

Six issues are presented on appeal. The first issue is whether § 11–37–13.2 violates defendant's right of confrontation as guaranteed by the Sixth and Fourteenth Amendments. The second is whether the statute violates a defendant's Sixth Amendment right to self-representation. The third is whether § 11–37–13.2 violates the Equal Protection Clause of the Fourteenth Amendment. The fourth inquiry is whether the statute violates the Due Process Clause of the Fourteenth Amendment, and the fifth is whether the admission into evidence of the out-of-court identification violated the Fourteenth Amendment. The sixth query is whether the trial judge erred by denying the motion for judgment of acquittal on the charge of kidnapping. We address each issue individually.

## I

The first query is whether § 11–37–13.2 violates defendant's right of confrontation as guaranteed by the Sixth and Fourteenth Amendments of the United States Constitution. The Sixth Amendment provides that a criminal defendant has the right "to be confronted with the witnesses against him * * *." U.S. Const. Amend. VI. At the core of the right of confrontation is both the cross-examination of witnesses and the defendant's physical presence as testimony is being given. *Coy v. Iowa,* 487 U.S. ——, 108 S.Ct. 2798, 2801, 101 L.Ed.2d 857, 864 (1988).

It has long been held that Sixth Amendment rights are not absolute, and a defendant's confrontation rights may give way in the face of important societal interests. *Chambers v. Mississippi,* 410 U.S. 284, 295, 93 S.Ct. 1038, 1046, 35 L.Ed.2d 297, 309 (1973); *Mattox v. United States,* 156 U.S. 237, 243, 15 S.Ct. 337, 339–40, 39 L.Ed. 409, 411 (1895). In regard to confrontation rights in relation to child victims of sexual assault, a recent case on this topic is *Coy v. Iowa,* 487 U.S. ——, 108 S.Ct. 2798, 101 L.Ed.2d 857 (1988).

In *Coy,* the United States Supreme Court struck down a general statutory presumption that every child victim of sexual assault needs to be shielded from a defendant's physical presence when testifying about the assault. The court held that such a general presumption violated a defendant's right under the Confrontation Clause to be physically present when testimony against him or her is given. *Id.* at ——, 108 S.Ct. at 2802, 101 L.Ed.2d at 866. The majority in *Coy* left for another day whether there are any exceptions to the right of confrontation in cases of child victims of sexual assault. *Id.* at ——, 108 S.Ct. at 2803, 101 L.Ed.2d at 867. The Court held that whatever these exceptions might be, they would be allowed only when they were necessary to further an important public policy. As to what would satisfy the requirement of necessity, the Court implied that individualized findings that a particular witness needed special protection might be sufficient to create an exception

to the confrontation right of being physically present when a victim testifies. *Id.* In a concurring opinion, Justice O'Connor agreed with the majority that exceptions to confrontation rights could be made in cases where special procedures for child sexual assault victims are necessary to further an important public policy. *Id.* at ——, 108 S.Ct. at 2805, 101 L.Ed.2d at 869. Justice O'Connor stated that the protection of child victims in such cases is an important public policy, and therefore, the primary focus in scrutinizing procedural devices to protect a child victim will be whether a court has made a case-specific, individualized finding. *Id.* Justice O'Connor held that when a court makes such a finding before allowing alternative procedural devices to be used for the child victim's testimony, this finding would create an exception to a defendant's confrontation rights. *Id.*

The Rhode Island Constitution also bestows upon criminal defendants the right "to be confronted with the witnesses against them * * *." R.I. Const., art. 1, sec. 10. For example, when a trial judge is ruling upon the admissibility of hearsay testimony and the out-of-court declarant is unavailable for cross-examination, a trial judge must make a specific finding that there is just cause for admitting the testimony and denying cross-examination. *State v. Potter*, 423 A.2d 67, 68 (R.I. 1980). Similarly, to support a finding that a witness is unavailable due to illness, expert testimony must establish that the witness' illness makes his or her testimony virtually impossible, not merely inconvenient. *State v. Hannagan*, 473 A.2d 291, 293 (R.I. 1984). The statute claimed to violate the Confrontation Clause in the present case is § 11–37–13.2. This statute applies to cases where the victim of a sexual assault is seventeen years old or younger at the time of trial. The statute provides that upon a showing by the prosecution that the child is unable to testify before the court without suffering unreasonable and unnecessary mental or emotional harm, the court may order that the child's testimony be taken by alternative means. The alternative means authorized are that the testimony will be given in a room other than the courtroom, and the testimony taken by one of two methods: either recorded and then later replayed at trial, or the testimony will be broadcast simultaneously into the courtroom by closed-circuit television. Section 11–37–13.2 has other features which we briefly note. The statute provides that present in the room with the child victim may be only the judge, the lawyers, persons running the equipment, and a parent of or companion to the child. The child shall be duly sworn, and direct examination and cross-examination shall be conducted as if at trial. Persons operating the equipment will be hidden from the child's sight and hearing. Under the statute, the defendant has the right to see and to hear the child's testimony live as it is being given, but the court must ensure that the child cannot see or hear the defendant. The defendant also has the right to communicate with his attorney at all times during the recording of the child's testimony. On the request of the defendant or his or her attorney, defendant has the right to have recesses granted to allow them to confer. As to technical requirements, the broadcast of the testimony must be: both visual and aural and recorded, the recording equipment must make an accurate recording, the equipment operator must be competent, the recording must be accurate and unaltered, each voice on the recording or broadcast must be identified, and each party must be allowed to view any recording made prior to trial before it is shown in the courtroom. Although the statute does not expressly state that defense counsel, the prosecutor, and the judge must view the videotape after it is made and all parties must agree that it is accurate, we hold that such procedure is required under § 11–37–13.2. Under the statute, if the court orders the child's testimony to be recorded and/or broadcast, the child will not be required to testify at the proceeding, and the recording or broadcast shall be used in lieu of the live testimony.

■ Through judicial interpretation, § 11–37–13.2 must be modified from its literal terms to accommodate the Rhode Island Constitution. As enacted,

§ 11–37–13.2 provides that when a child is thirteen or younger at the time of trial, there shall be a rebuttable presumption that the child is unable to testify before the court without suffering unreasonable and unnecessary mental or emotional harm. However, the trial judge held that this statutory presumption violates the Confrontation Clauses of both the Federal and our State Constitutions. We agree. Under art. 1, sec. 10 of the Rhode Island Constitution, the right to confrontation will give way to exceptions only upon a finding that, in the specific case at hand, the exception is necessary to an important public policy. Thus under the Confrontation Clause of the Rhode Island Constitution, the presumption in § 11–37–13.2 that children thirteen and under at the time of trial who are victims of sexual assault will suffer unreasonable and unnecessary mental or emotional harm is unconstitutional. We hold that portion of § 11–37–13.2 invalid.

■ A second constitutionally required modification of § 11–37–13.2 is the construction of "unreasonable and unnecessary mental or emotional harm." Under the Confrontation Clause of the Rhode Island Constitution, the phrase "unreasonable and unnecessary mental or emotional harm" in § 11–37–13.2 means that the child witness is unavailable to testify because of his or her inability to do so.

■ Because the right to be physically present during the victim's testimony is a core value under the Confrontation Clause of the Rhode Island Constitution, a third constitutionally mandated modification of § 11–37–13.2 is that "unreasonable and unnecessary mental or emotional harm" must be shown by clear and convincing evidence. That is, that the child is unavailable due to an inability to testify must be shown by a clear-and-convincing-evidence standard of proof.

■ A fourth constitutionally required modification of the statute is that in almost every case, to set forth a prima facie case of "unreasonable and unnecessary mental or emotional harm" or unavailability, the Rhode Island Confrontation Clause requires that an attempt must be made to have the child testify in the defendant's presence. If such an attempt is unsuccessful as the child is unable to communicate, then expert testimony based upon a psychological examination of the victim must be sought. Both the state and the defense may retain experts in child psychology.

■ In the case at bar, the trial judge ruled that § 11–37–13.2's presumption regarding child victims thirteen and under at the time of trial was unconstitutional, and we agree. However, the trial judge also ruled that when Sally froze at the June 19, 1986 suppression hearing that this occurrence was no evidence of Sally's suffering "unreasonable and unnecessary mental or emotional harm." While we affirm the judge's order, we hold that Sally's prior behavior at the pretrial hearing is some evidence of her suffering unreasonable and unnecessary mental or emotional harm. Her prior inability to testify, coupled with expert testimony based on a reasonable medical certainty that Sally would be unable to testify in defendant's presence, was a sufficient showing to allow her to testify via videotape. As to the standard of proof, the showing made met the standard of clear-and-convincing evidence. The trial judge unequivocally found that Sally would be unable to testify and as such she was unavailable. We affirm the order of the trial judge on this point.

Section 11–37–13.2, as modified above and applied in the case at bar, does fall within an exception to the right to face-to-face confrontation under the Sixth Amendment of the United States Constitution. First, protecting child victims of sexual assault is an important public policy. Second, an alternative method of taking and admitting Sally's testimony is necessary in order to prosecute and thereby deter sexual assault against children. As Sally was terrified of her assailant, the case could not have gone to trial with Sally's testimony unless her testimony was taken by an alternative method. Thus defendant's absence from Sally's presence was necessary to allow her to testify and the case to go forward.

## II

■ The second inquiry is whether § 11–37–13.2 violates defendant's right of self-representation as guaranteed by the Sixth Amendment of the United States Constitution. The Sixth and Fourteenth Amendments set forth a framework in which a criminal defendant has a right to act as his or her own attorney. *Faretta v. California,* 422 U.S. 806, 818, 95 S.Ct. 2525, 2532, 45 L.Ed.2d 562, 572 (1975). In *Faretta* weeks before trial the defendant unequivocally declared to the trial judge that he wanted to undertake his own representation, and did not want appointed counsel. *Id.* at 807, 95 S.Ct. at 2527, 45 L.Ed.2d at 566. The record showed that the defendant was literate, competent, and understanding. In reviewing the trial court's ruling that the defendant must accept counsel, the United States Supreme Court held that the defendant was voluntarily exercising his informed free will when he declined to accept counsel, and that under these circumstances the defendant was deprived of his constitutional rights when he was forced to accept a public defender. *Id.* at 835–36, 95 S.Ct. at 2541, 45 L.Ed.2d at 582. However, in some circumstances a defendant may lose his constitutional right to conduct his own defense. *Illinois v. Allen,* 397 U.S. 337, 343, 90 S.Ct. 1057, 1060–61, 25 L.Ed.2d 353, 359 (1970).

In the case at bar, Taylor was arrested on July 19, 1985. A motion to suppress identification testimony was heard on June 19, 1986. It was February 9, 1987 when his state-appointed counsel made a motion to withdraw from the case because Taylor wished to represent himself. We note that the motion to withdraw was made approximately one-and-a-half years after defendant's arrest, and the case was scheduled to go to trial the following week. The defendant was charged with very serious offenses, and we do not believe that on such a late date defendant would have been able to undertake his own defense in a competent manner. At the time of the *motion* to withdraw, the trial judge stated that he believed that defendant and his lawyer were attempting to create the issue for appeal that § 11–37–13.2 deprived a defendant of his constitutional right to represent himself because defendant himself could not undertake the examination of the victim. However, we note that the denial of defendant's motion to represent himself was based upon the motion's being untimely. However, we see no conflict between the Sixth Amendment right to self-representation and § 11–37–13.2. In a case where a defendant states at an early date and in an unequivocal manner that he or she wishes to proceed pro se, standby counsel will be appointed to conduct the examination of the child victim. Through the use of headsets or other techniques affording two-way communication, the questions posed to examine the child victim may be authored by the defendant. Thus § 11–37–13.2 does not violate a defendant's right of self-representation, as he or she is able to undertake selfrepresentation, albeit in a slightly modified form.

## III

■ The third query is whether § 11–37–13.2 violates the Equal Protection Clause of the Fourteenth Amendment. When a statute's diverse treatment of classes of persons infringes upon a fundamental right or creates a suspect class, strict scrutiny is the applicable standard of review. Such legislatively imposed discrimination is constitutional only if it is necessary to a compelling state interest. *Zablocki v. Redhail,* 434 U.S. 374, 388, 98 S.Ct. 673, 682, 54 L.Ed.2d 618, 631 (1978); *Loving v. Virginia,* 388 U.S. 1, 11, 87 S.Ct. 1817, 1823, 18 L.Ed.2d 1010, 1017 (1967). If, however, the statute neither infringes on fundamental rights nor creates a suspect class, then the applicable standard of review is whether the statute bears a reasonable relationship to a legitimate state interest. *Dunn v. Blumstein,* 405 U.S. 330, 336–37, 92 S.Ct. 995, 999–1000, 31 L.Ed.2d 274, 280–81 (1972). The protection of the psychological and physical well-being of minor children is a compelling and therefore also a legitimate state interest. *See New York v. Ferber,* 458 U.S. 747, 756–57, 102 S.Ct. 3348, 3354, 73 L.Ed.2d 1113, 1122 (1982); *Globe Newspaper Co. v. Superior*

*Court,* 457 U.S. 596, 607, 102 S.Ct. 2613, 2620, 73 L.Ed.2d 248, 258 (1982).

The defendant asserts that § 11–37–13.2 violates the Equal Protection Clause by infringing upon the fundamental right to confront witnesses. However, under § 11–37–13.2, the right of confrontation is not infringed upon entirely, but rather is only slightly diminished. Two of the core values of the Confrontation Clause are physical presence while testimony is being given, and cross-examination. The defendant has the right to be present physically while all witnesses testify against him, except for the child victim. The defendant also has the right to cross-examine all witnesses testifying against him, including the child victim. If the defendant proceeds pro se, the defendant may be the author of all queries asked of the child victim on cross-examination, although someone other than the defendant would pose the questions. Thus, § 11–37–13.2 does not impinge on a fundamental right. As to a suspect classification, defendants charged with sexually assaulting persons who are age seventeen or younger at the time of trial do not constitute a suspect classification. Thus we consider whether § 11–37–13.2 bears a reasonable relationship to a legitimate state interest. The protection of victims of sexual assault who are aged seventeen or under at the time of trial is a legitimate state interest. The provisions of § 11–37–13.2 are reasonably related to the protection of sexual assault victims who are minors at the time of trial as § 11–37–13.2 applies to such victims and responds to their conflicting concerns of potential unavailability and the desire to prosecute. Therefore § 11–37–13.2 does not violate the Equal Protection Clause of the Fourteenth Amendment.

### IV

■ The fourth issue is whether § 11–37–13.2 violates the Due Process Clause of the Fourteenth Amendment. Under the Due Process Clauses of the United States and Rhode Island Constitutions, a criminal defendant has the right to a fair trial and the presumption of innocence. U.S. Const., Amend XIV; R.I. Const., art. I, sec. 10. A trial practice which is inherently prejudicial will violate a defendant's right to a fair trial and presumption of innocence. *Holbrook v. Flynn,* 475 U.S. 560, 567, 106 S.Ct. 1340, 1345, 89 L.Ed.2d 525, 533 (1986); *Estelle v. Williams,* 425 U.S. 501, 512–13, 96 S.Ct. 1691, 1697, 48 L.Ed.2d 126, 135 (1976); *State v. Carmody,* 471 A.2d 1363, 1366 (R.I.1984). It is asserted that the practice of allowing a child to testify via videotape or closed-circuit television is inherently prejudicial.

Videotaping and closed-circuit-television technology and the wishes of counsel to introduce evidence taken in such media have created a new and developing area of the law. The law regarding when, if at all, videotapes and closed-circuit television will be used in criminal trials is rapidly developing. *See* Note, *The Testimony of Child Victims in Sex Abuse Prosecutions: Two Legislative Innovations,* 98 Harv. L. Rev. 806 (1985). There is much speculation concerning the influence the admission of testimony via videotape or closed-circuit television will have on a jury. However, we believe that the jury or finder-of-fact will not be prejudiced by the presentation of videotaped testimony. Rather, we have viewed the videotape and believe the main inference a jury may draw as to why testimony was presented via videotape or closed-circuit television is that for some reason the witness was unable to make a live court appearance. The reason why the witness could not appear may be open to speculation as the jury may suppose that the child had moved from the area, was sick, or was traumatized by the occurrence and so was unable to testify in a public setting. It is also possible that the jury could speculate that the testimony was allowed via videotape because the child was afraid of the defendant. However, to ensure that such speculation does not prejudice a defendant, when a trial judge allows videotaped or broadcast testimony into evidence under § 11–37–13.2, it is mandatory that an instruction be given which informs the jury that they are not to infer that the

child is afraid of the defendant or that he or she is guilty.

In the case at bar, the trial judge admitted Sally's testimony via videotape. At the time the videotape was played for the jury, the trial judge instructed the jury that they were not to draw an inference of guilt or that the victim needed physical protection from defendant because the testimony was presented on videotape. Thus defendant was not prejudiced by Sally's testimony via videotape.

## V

■ The fifth issue is whether the trial judge erred in admitting the victim's out-of-court identification of defendant. It is asserted that the out-of-court identification was improperly admitted as it was constitutionally impermissible due to the identification being so unnecessarily suggestive and conducive to irreparable mistaken identification that it denied defendant due process of law. In deciding whether to admit a suggestive identification, the trial judge must consider the totality of the circumstances and balance the suggestive nature of the identification procedure against the independent reliability of the identification due to such factors as the witness's opportunity to view the accused during the crime, the witness' degree of attention, the witness's certainty at the time of the identification, the accuracy of the witness' prior descriptions given by the witness, and the length of time between the crime and the identification. *Manson v. Brathwaite*, 432 U.S. 98, 114–16, 97 S.Ct. 2243, 2253–54, 53 L.Ed.2d 140, 154–55 (1977); *Stovall v. Denno*, 388 U.S. 293, 301–02, 87 S.Ct.1967, 1972, 18 L.Ed.2d 1199, 1206 (1967); *State v. Brown*, 549 A.2d 1373, 1379 (R.I.1988).

In the instant case, the claimed unnecessarily suggestive procedure is Sally's identification of defendant while he was in the back of a police car, and in what defendant asserts was a lynch-mob atmosphere. It is true that defendant was in the back seat of a police vehicle and that a hostile crowd was present. The independent reliability of the identification also must be considered. Sally stated that she had the opportunity to view defendant during the crime, since after the blanket came off, her perpetrator slapped her, kissed her, and told her if she screamed, he'd kill her. During these occurrences Sally had the opportunity to view defendant. We also believe Sally was attentive during the crime as despite the traumatic occurrences, seven-year-old Sally was able to comprehend that defendant climbed a tree, that this action gave her the opportunity to escape, she did escape, and was aware enough of her environment to find her way home. Later Sally was able to find her way back to the place where the crimes transpired. As to the certainty of her identification, Sally's mother testified that she said to Sally "[n]ow you take a good look and be sure if that's him." Officer Turchetti said that he told Sally that he wanted her to tell him if she'd ever seen the man in the back seat before. Sally remembered the question being posed to her as "[i]s this the guy?" In whatever manner the question was asked, immediately upon viewing defendant in the back of the police car, Sally responded "[t]hat's him!" This account of Sally's response was corroborated by her mother, Traylor, and several of the police officers present. Sally's identification of defendant was certain. Sally's prior description of defendant when she ran home immediately after the assault was a black man, thin, no shirt, and wearing jeans. This prior description was consistent with defendant's appearance when Sally later identified him. The time between the crimes and the identification was estimated by various witnesses to be from twenty-five minutes to one-and-one-half hours. After weighing the suggestive nature of the identification procedure against the independent reliability of the identification, we believe the out-of-court identification was properly admitted and not constitutionally impermissible.

## VI

■ The sixth and last issue is whether the trial justice erred by denying the motion for judgment of acquittal on the charge of kidnapping. General Laws 1956 (1981 Reenactment) § 11–26–1 provides that:

"Whoever, without lawful authority, forceably or secretly confines or imprisons another person within this state against his will, or forceably carries or

sends another person out of this state, or forceably seizes or confines or inveigles or kidnaps another person with intent either to cause him to be secretly confined or imprisoned within this state against his will or to cause him to be sent out of this state against his will, shall be guilty of a felony * * *."

One of the essential elements of kidnapping is that there be a confinement or imprisonment of the victim. *State v. Lambert,* 463 A.2d 1333, 1340 (R.I.1983). To fall within the kidnapping statute, the confinement or imprisonment must have some independent significance from other crimes committed, and cannot be merely that confinement necessary for the commission of other crimes. *State v. Innis,* 433 A.2d 646, 655 (R.I.1981). A confinement that is incidental to the commission of a crime is not punishable under § 11–26–1.

In the present case, the defendant entered a home, saw a sleeping child, wrapped her up in the bedspread on which she was sleeping, and carried her outside. The defendant then transported the child over two fences and took her to a place in front of the garage several houses away. It was in front of the garage that the defendant sexually assaulted Sally. This confinement of Sally was more confinement than necessary to perpetrate the sexual assault. The trial judge did not err in denying defendant's motion for judgment of acquittal on the charge of kidnapping.

It is worthy of note that the present case was tried with great sensitivity and perception by very able justices before the *Coy* opinion was issued. Upon an analysis of the six issues indicated, the defendant's appeal is denied and dismissed. The judgment appealed from is affirmed. The papers of this case are remanded to the Superior Court.

## APPENDIX

11–37–13.2. Alternative methods of victim testimony—Child victim.—In any judicial proceeding in which a person has been charged with sexual assault of a child who at the time of trial is seventeen (17) years of age or less, the court may order, upon a showing that the child is unable to testify before the court without suffering unreasonable and unnecessary mental or emotional harm, that the testimony of the child be taken in a room other than the courtroom and either be recorded for later showing before the court and/or the finder of fact in the proceeding or be broadcast simultaneously by closed circuit television to the court and/or finder of fact in the proceeding. When the child is thirteen (13) years of age or younger at the time of trial, there shall be a rebuttable presumption that said child is unable to testify before the court without suffering unreasonable and unnecessary mental or emotional harm. Only the judge, attorneys for the parties, persons necessary to operate the recording or broadcasting equipment, and any person whose presence would contribute to the welfare and well-being of the child may be present in the room with the child during his or her testimony. Examination and cross-examination shall proceed in the same manner as permitted at the trial or hearing.

The persons operating the equipment shall be confined to an adjacent room or behind a screen or mirror which permits them to see and hear the child during his or her testimony, but does not permit the child to see or hear them. The court shall permit the defendant to observe and hear the testimony of the child in person, but ensure that the child cannot hear or see the person alleged to have committed the assault. The defendant shall be afforded a means of communicating with his attorney throughout the proceedings, and, upon request of the defendant or his attorney, recesses shall be permitted to allow them to confer. The court shall ensure that: (1) the recording or broadcast is both visual and aural and is recorded on film or videotape or by other electronic means; (2) the recording equipment was capable of making an accurate recording, the operator of the equipment was competent, and the recording is accurate and has not been altered; (3) each voice on the recording is identified; (4) each party is afforded an opportunity to view any recording made prior to trial before it is shown in the courtroom; and (5) the statement is sworn to under oath by the child.

If the court orders the testimony of a child to be so recorded or broadcast, the child shall not be required to testify at the proceeding for which the testimony was taken, and such testimony shall be used in lieu of the live testimony of the child.