STATE

v.

**Jose A. LOPEZ.**

**No. 2006–50–C.A.**

Supreme Court of Rhode Island.

March 26, 2008.

---

Lauren S. Zurier, Esq., Providence, for Plaintiff.

Paula Rosin, Esq., Providence, for Defendant.

Present: WILLIAMS, C.J., GOLDBERG, FLAHERTY, SUTTELL, and ROBINSON, JJ.

## O P I N I O N

Justice ROBINSON for the Court.

The defendant, Jose A. Lopez, appeals from his conviction by a jury of the volun-

tary manslaughter of one Rafael Graciano.[1] Mr. Lopez contends that the trial justice violated his constitutional rights when he refused to permit defense counsel to cross-examine the decedent's brother, Richard Susana, regarding the decedent's alleged involvement in drug dealing and his alleged past incarceration. The defendant also argues that the trial justice erred in denying his motion for a judgment of acquittal, in which motion he contended that the prosecution had failed to meet its burden with respect to his claim of self-defense.

For the reasons set forth herein, we affirm the judgment of the Superior Court.

## Facts and Travel

On October 10, 2002, a grand jury returned an indictment against defendant, charging him with one count of murder. A jury trial was held in June of 2005.

The following relevant facts have been adduced from the testimony of various witnesses at trial.

According to the testimony of Tiffany Alvarez, who resided in the City of Woonsocket, at about 7 p.m. on April 20, 2002, she was sitting on the couch in her house when, as she looked outside through her window, she saw a man stumble and fall. She then went outside, where she observed the man lying face down on the ground, his clothing covered with blood. Ms. Alvarez called 911, and she thereafter observed that a knife was sticking out of the man's chest.

Woonsocket police officer Mark Cabral, who arrived at the scene following Ms. Alvarez's call, testified that he saw rescue

---

1. In order to make this opinion easier for the reader to follow, we shall frequently refer to Rafael Graciano as "the decedent."

personnel begin to perform CPR on the man and then move him into an ambulance for treatment and transport. Officer Cabral testified that he followed a trail of blood from the scene, saw that blood had been smeared on a number of vehicles along the way, and concluded that the wounded man had walked while bleeding profusely. Officer Cabral opined that the man who had been stabbed had leaned on those cars in order to "hold himself up as he was navigating his way down the sidewalk." Following the trail of blood to a driveway, Officer Cabral came upon a green Ford Windstar minivan that was parked there, with its motor not running and with its driver's side door open. He further testified that both the driver's seat and the driver's compartment of the minivan were "saturated" with still-wet blood.

Woonsocket police officer Russell Cote testified that he traveled to the hospital where the victim of the stabbing had been transported while the police department's investigation of the crime was ongoing. While at the hospital, he learned that the victim's name was Rafael Graciano. He testified that, shortly after Mr. Graciano arrived at the hospital, a doctor pronounced him dead. Officer Cote prepared an inventory of the items that Mr. Graciano had on his person when he arrived at the hospital; he recalled in his testimony that, among other belongings, Mr. Graciano had in his possession a wallet containing $84 in cash.

Detective Shawn Kerrigan, also of the Woonsocket Police Department, responded to a call that night from the police officer in charge of the investigation; Detective Kerrigan was advised that the Department's investigation had ascertained that a fight had occurred in a van and that one of the parties involved had subsequently died. In his testimony, Detective Kerrigan described how he examined the Windstar minivan and the "large amount of blood" on the driver's seat and the passenger's seat. He testified that he observed a knife handle on the floor of the minivan, between the front and middle rows of seats.

During the course of his investigation, Detective Kerrigan learned that a man named Richard Susana, the brother of the decedent, had had some involvement with defendant not long before the April 20 date when the homicide at issue occurred; in particular, the detective learned that all three of the men had met together at a convenience store shortly before April 20.

According to the testimony of Detective Kerrigan, the police department obtained from a Store 24 in Central Falls its surveillance tapes for April 18, 2002; Detective Kerrigan then played those tapes at the Woonsocket · police station with Mr. Susana present. Detective Kerrigan testified that defendant's image appeared in the April 18 footage and that Mr. Susana told the detective that both he and his brother (Mr. Graciano) had met defendant for the first time at the Store 24 on April 18; Mr. Susana added that he and Mr. Graciano had then driven defendant to Woonsocket on that date.

While being cross-examined, Detective Kerrigan testified that he learned, as a result of his investigation into the April 20 homicide, that both Mr. Susana and the decedent had a history of involvement in drug dealing. It was further the detective's testimony that he had learned during his investigation that the decedent and defendant had known each other prior to their encounter at the Store 24 on April 18.

The testimony of Mr. Susana on the issue of the duration of the acquaintanceship between the two brothers and defendant conflicted with the just-summarized testimony of Detective Kerrigan. According to the testimony of Mr. Susana, he and his brother had not been acquainted with

defendant until they met at a Capital Farms store in Central Falls on April 18, 2002.[2] He testified that defendant approached Mr. Graciano and him at the convenience store on that date and inquired whether they could provide him with "a couple of bucks or a ride to Woonsocket." According to Mr. Susana's testimony, he and defendant discussed the possibility of defendant's rendering assistance to Mr. Graciano in the latter's search for an apartment in Woonsocket. He recalled on cross-examination that Mr. Graciano had remarked to him when they encountered defendant in the convenience store that "probably God put [defendant] in the middle of his [Mr. Graciano's] way because he wanted to move to Woonsocket."

Mr. Susana testified that, after they had conversed in the parking lot of the convenience store on April 18, he and Mr. Graciano drove defendant to Woonsocket and the two brothers afterwards returned to Central Falls. It was further Mr. Susana's testimony that Mr. Graciano planned to visit an apartment with defendant in the near future and that he traveled to Providence to borrow a green minivan for that purpose.

In summary, the version of events that Mr. Susana related in his testimony was that, when defendant (Mr. Lopez) approached him and his brother (Mr. Graciano) at the convenience store on April 18, 2002, and after Mr. Graciano realized that defendant (allegedly a stranger to him) was in need of a ride to Woonsocket, Mr. Graciano agreed to drive him to that city because he hoped that defendant could assist him in finding an apartment to rent.

During the course of defense counsel's cross-examination of Mr. Susana, the issue of that witness's purported involvement in the drug business arose. Defense counsel asked about Mr. Susana's employment at a laundromat in Warwick; he then inquired about "some other work" in which Mr. Susana might be engaged, and he made that inquiry less general by adding the suggestive words: "like sell[ing] drugs[.]" After the prosecutor objected, the trial justice conducted a conference outside the presence of the jury, wherein he inquired whether the witness had ever been convicted of a drug crime, to which defense counsel responded, "I believe he has" and the prosecutor responded, "He has not." During the bench conference, defense counsel asserted that the issue of involvement in the drug business related "to the heart of the defense." He explained that defense theory as an attempt to prove the following:

> "Mr. Graciano * * * put a knife to Mr. Lopez's throat to collect drug money that Mr. Lopez owed him because Mr. Lopez and he—and it's acknowledged by Detective Kerrigan in the Grand Jury— knew each other for a much longer time, and this individual indicated [that] they didn't know each other at all."

The trial justice responded: "That may be your defense, but you can't get it in through the question just asked." Significantly, however, defense counsel did not attempt to pose another question with re-

---

**2.** In his testimony concerning what occurred on April 18, 2002, Richard Susana made reference to three different convenience stores. Mr. Susana first testified that the events of the night of April 18 began in a Cumberland Farms store. He then corrected himself to say that those events actually occurred at the Capital Farms store in Central Falls. Mr.

Susana further testified that, because the Capital Farms store, where he and Mr. Graciano first encountered defendant, was closed, the three then traveled to the Store 24 in Central Falls. The surveillance tapes which the Woonsocket police obtained and in which defendant's image was perceptible were from that Store 24.

spect to this issue during his cross-examination of Mr. Susana.

The credibility of Mr. Susana's testimony became open to question during the course of the trial as different versions of the events at issue came to the attention of the jury. In contrast to Mr. Susana's live trial testimony, the prosecution introduced at trial an edited transcript of defendant's taped interview with Woonsocket detectives, which interview was conducted shortly after the April 20, 2002 homicide. During the interview, defendant told Woonsocket detectives that he had known the decedent as a drug dealer for about one year.

The defendant opted to testify at his trial, and his version of events also differed from the version related in Mr. Susana's testimony. The defendant testified that, at the time of the above-summarized events, he had been an habitual user of heroin[3] and cocaine; he added that, during the seven or eight months preceding his altercation with the decedent, he had been in contact with him about two or three times a week in order to purchase drugs.

The defendant testified that Mr. Graciano had over time become very aggressive in reminding him about a debt which he purportedly owed him for drugs that he had purchased; he added that, on one occasion, Mr. Graciano had showed him a gun and said, "[T]his is what is for you." According to defendant's testimony, on April 20, 2002, the day of the fatal altercation, he had gone to the Capital Farms store in Central Falls and noticed Mr. Graciano parked in a green van outside of the store. He testified that Mr. Graciano began to question him regarding the money he owed him; he added that, when he told Mr. Graciano that he did not have

time to discuss the matter because he was leaving for Woonsocket, Mr. Graciano offered to drive him there. The defendant denied that he had accompanied Mr. Graciano to Woonsocket on April 20 in order to look for an apartment—as had been the version of events narrated by Mr. Susana in his testimony.

The defendant testified that, before he and Mr. Graciano arrived in Woonsocket, Mr. Graciano, while still driving, put a knife to his neck and demanded money. He added that Mr. Graciano eventually parked the van and told defendant that if he moved he would kill him. According to defendant, a struggle ensued. Mr. Lopez testified that he could not remember stabbing Mr. Graciano except for once in the abdomen; he further testified that he was unable to escape because Mr. Graciano was of much greater stature and weight than he. He testified that he had acted in self-defense.

At the close of the prosecution's case, defendant moved for a judgment of acquittal, which motion the trial justice denied. The defendant renewed his motion for a judgment of acquittal at the close of all the evidence, which motion the trial justice also denied. On June 16, 2005, the jury acquitted defendant of murder, but found him guilty of the lesser-included offense of manslaughter. The defendant received a thirty-year sentence, with eighteen years to serve and the balance suspended, with probation. A judgment of conviction and commitment was entered on October 3, 2005, and defendant filed a notice of appeal on October 6, 2005.

On appeal, defendant asserts that the trial justice violated his right to confrontation when he refused to allow defense counsel to cross-examine Mr. Susana about whether he had sold drugs, whether the

---

**3.** During cross-examination, defendant admitted to having a $225 daily heroin habit.

decedent had had a history of drug dealing, and whether the decedent had been incarcerated. He alleges that "[t]he heart of this case concerned whether Rafael Graciano was a drug dealer who threatened [defendant] because he owed him money or whether he was a naïve apartment seeker that [defendant] planned to rob and kill." Mr. Lopez contends that evidence of the decedent's drug dealing was essential to his defense against the state's theory that defendant robbed the decedent. He also argues on appeal that Rule 806 of the Rhode Island Rules of Evidence [4] required the trial justice to admit evidence of the decedent's history as a drug dealer. The defendant additionally argues on appeal that the trial justice erred in denying his motion for a judgment of acquittal because the prosecution failed to meet its burden of proving beyond a reasonable doubt that he did not act in self-defense when he fatally wounded Mr. Graciano.

The prosecution, for its part, maintains that the trial justice properly limited cross-examination of Mr. Susana. The prosecution argues that defendant failed to make any evidentiary proffer at trial regarding the decedent's drug dealing or incarceration; it further asserts that, in any event, the jury was nevertheless amply informed of the decedent's alleged history as a drug dealer. The prosecution contends that the jury was so informed through (1) the admission into evidence of defendant's statement to the police, (2)

defendant's own testimony at trial, and (3) the testimony of Detective Kerrigan. The introduction of this evidence, the prosecution contends, enabled defense counsel to argue during his closing argument that the testimony of Mr. Susana was not credible. In light of these factors, the prosecution submits that any arguable error in connection with restricting cross-examination on the drug-dealing issue would be harmless beyond a reasonable doubt, and it urges that the judgment of conviction should accordingly be affirmed by this Court.

## Standard of Review

As to defendant's claim that his constitutional rights of confrontation and cross-examination and the right to present a defense were violated, we engage in a *de novo* review of such constitutional claims. *See State v. Quinlan*, 921 A.2d 96, 106 (R.I.2007); see also *Moniz v. State*, 933 A.2d 691, 694 (R.I.2007). Concerning defendant's argument that he should have been allowed to introduce evidence that the decedent had been a drug dealer, this Court has held that it "will not disturb a trial justice's ruling on an evidentiary issue unless that ruling constitutes an abuse of the justice's discretion that prejudices the complaining party." *State v. Hallenbeck*, 878 A.2d 992, 1015 (R.I.2005) (internal quotation marks omitted).

■ Finally, in reviewing a denial of a motion for judgment of acquittal, we em-

---

**4.** Rule 806 of the Rhode Island Rules of Evidence provides, in pertinent part:

"*Attacking and supporting credibility of declarant.*—When a hearsay statement * * * has been admitted in evidence, the credibility of the declarant may be attacked, and if attacked may be supported, by any evidence which would be admissible for those purposes if declarant had testified as a witness. Evidence of a [statement] or conduct by the declarant at any time, inconsistent with the declarant's hearsay state-

ment, is not subject to any requirement that the declarant may have been afforded an opportunity to deny or explain."

The defendant's argument based on Rule 806 is that "since the trial court improperly permitted Richard Susana to testify to a hearsay statement made by Rafael Graciano, evidence that would have been admissible to attack the credibility of Mr. Graciano, had he testified at trial, must be admitted to impeach his credibility."

ploy the same standard that the trial justice used, and we view the evidence in the light most favorable to the state; we then determine whether the evidence is sufficient to sustain a verdict of guilty beyond a reasonable doubt. *State v. Grayhurst*, 852 A.2d 491, 519–20 (R.I.2004); *see also State v. Boillard*, 789 A.2d 881, 888 (R.I.2002).

### Analysis

 The Sixth Amendment to the United States Constitution, made applicable to the states through the Fourteenth Amendment, affords a criminal defendant the right to confront and cross-examine the witnesses against the accused. *State v. Ramirez*, 936 A.2d 1254, 1260 (R.I.2007). In addition, the Declaration of Rights, article 1, section 10, of the Rhode Island Constitution, provides that "[i]n all criminal prosecutions, accused persons shall enjoy the right * * * to be confronted with the witnesses against them." As we recently stated in *State v. Tiernan*, 941 A.2d 129, 133 (R.I.2008), the right of confrontation has "ancient and venerable roots." In that same opinion, we also noted that this Court has "ardently protected" that important right. *Id.*

 The right of confrontation "means more than being allowed to confront the witness physically." *Davis v. Alaska*, 415 U.S. 308, 315, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974). We have previously declared that "[t]he right of cross-examination is guaranteed to a criminal defendant because it is the principal means by which the credibility of the witness and the truthfulness of his [or her] testimony can be tested." *State v. Parillo*, 480 A.2d 1349, 1357 (R.I.1984) (internal quotation marks omitted).

 While this Court has recognized the importance of the right to cross-examine a witness by describing it as the "primary means by which a criminal defendant may challenge the veracity of a witness's testimony," we have simultaneously observed that this right is "far from absolute." *State v. Briggs*, 886 A.2d 735, 745 (R.I.2005). Once trial counsel has been permitted to engage in a sufficient degree of cross-examination to satisfy the requirements of the Sixth Amendment, however, trial justices retain a considerable degree of discretion to impose reasonable limitations on cross-examination. *See Delaware v. Van Arsdall*, 475 U.S. 673, 679, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986); *Tiernan*, 941 A.2d at 134; *see also United States v. Hatch*, 514 F.3d 145, 157–58 (1st Cir.2008). Although it is an important right, the right to cross-examine a witness is nevertheless "tempered by the dictates of practicality and judicial economy," and trial justices may in the exercise of sound discretion limit the scope of cross-examination. *Ramirez*, 936 A.2d at 1261 (internal quotation marks omitted); *see Tiernan*, 941 A.2d at 134; see also *State v. McLaughlin*, 935 A.2d 938, 942–43 (R.I.2007); *State v. Oliveira*, 882 A.2d 1097, 1122 (R.I.2005).

 In the case before us, defendant argues that the trial justice erred when he sustained the prosecutor's objection to defense counsel's inquiry of Mr. Susana as to whether or not he was involved in illegal drug business with the decedent. At trial, defense counsel articulated two reasons for that inquiry: (1) that the question related to "the crux of the defense [theory]" that Mr. Graciano had attacked defendant in order to collect drug money that defendant owed him; and (2) to attack Mr. Susana's credibility by calling into question his testimony on direct examination that neither he nor his brother (the decedent) had known defendant before their convenience store meetings with him on April 18.

The defendant argues that the trial justice's decision to call a halt to that

particular inquiry violated his right of confrontation. The defendant additionally maintains that the trial justice's termination of the cross-examination of Mr. Susana with respect to the issue of drug-dealing operated to deny him his constitutional right to present a defense and to have a fundamentally fair trial. He maintains that, although the information would not have placed the decedent in a favorable light, the inquiry was not impermissibly prejudicial, nor was the evidence confusing, repetitive or cumulative. Therefore, argues defendant, the trial judge erred when he excluded the inquiry.

■ In our view, it is significant that ample information concerning Mr. Graciano's purported history of drug dealing did come to the attention of the jury from other live witnesses during the course of the trial. For this reason, we need not and do not decide whether or not there was error in the specific evidentiary ruling as to the single question at issue, because any such error would in any event be harmless beyond a reasonable doubt. *See State v. Motyka*, 893 A.2d 267, 280 (R.I. 2006) ("A trial justice's determination as to the permissible scope of cross-examination * * * will be disturbed on appeal only upon a clear showing of abuse of discretion *and only if it constitutes prejudicial error*.") (emphasis added); *see also Briggs*, 886 A.2d at 745 (concluding that a trial justice's ruling on the issue of cross-examination, even if it constitutes an abuse of discretion, will be disturbed on appeal only if it resulted in prejudicial error). The United States Supreme Court has defined "harmless error" as an error that "in the setting of a particular

case [is] so unimportant and insignificant that [it] may, consistent with the Federal Constitution, be deemed harmless, not requiring the automatic reversal of the conviction." *Chapman v. California*, 386 U.S. 18, 22, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).[5] This Court has furthermore stated that ascertaining whether or not an error is harmless turns on whether it is reasonably possible that the error contributed to the conviction. *State v. Lachapelle*, 112 R.I. 105, 112–13, 308 A.2d 467, 471 (1973) (explaining the holding in *Chapman*). While keeping in mind the stringent criteria set forth in *Chapman* and *Lachapelle*, we have considered the entire record in this case, and it is our view that any alleged error in the cited evidentiary ruling was harmless beyond a reasonable doubt.

The jury did learn of the decedent's purported involvement in the drug business from both the in-court testimony of defendant and from his statement to the police that was admitted into evidence. Moreover, defendant's testimony as to that issue was corroborated by the testimony of Detective Kerrigan, who testified from a position of experience and authority and who may have appeared to the jury as a more objective witness than defendant may have seemed. For this reason, defense counsel was, at the close of the trial, in a position to draw on the information provided by defendant himself and by Detective Kerrigan for the purpose of arguing to the jury that the testimony of Mr. Susana as to the lack of a prior relationship with defendant was simply not credible. And, in fact, defense counsel did argue to that effect in his palpably sardonic and accusatory closing:

---

5. When conducting a harmless error analysis, we are always mindful of the principle that, "before a federal constitutional error can be held harmless, the court must be able to de-

clare a belief that it was harmless beyond a reasonable doubt." *Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).

"All this stuff about the apartment and that [defendant] was going to get him an apartment, that's all bologna, to put it nicely. * * * Richard [Susana] talked to us on the stand, he said these guys didn't know each other. Oh, no, he didn't know him. If [Mr. Susana] didn't—if [decedent] and [defendant] didn't know each other and all it was, was just a chance encounter and a ride to Woonsocket where—because maybe he could find an apartment for me, this guy who just happens to bump into us in the parking lot * * *. You know from the police officers that [decedent] and [defendant] knew each other, so Richard Susana has to have lied to you on the stand when he said this mythical, fictional conversation occurred."

It is clear that the trial justice's decision not to permit one particular question to be posed to Mr. Susana did not preclude defense counsel from being able to mount a vigorous record-based attack on the credibility of that witness. The jury had been made aware during the trial of the involvement of the above-referenced persons in the drug business, and certainly the jurors were reminded in defense counsel's closing that there was reason to doubt the veracity of the testimony of Mr. Susana.[6]

▮ As to defendant's argument that the trial justice improperly prevented him from inquiring about whether Mr. Susana knew about the decedent's purported prior incarceration, we conclude that the trial justice properly excluded this inquiry. In his brief to this Court, defendant argues that his purpose in pursuing the issue of the decedent's alleged incarceration during

cross-examination of Mr. Susana was that, in the eyes of the jury, the decedent's purported prior incarceration might have "affected the credibility of Susana." Stating that, although he takes an "expansive view" with respect to the admission of evidence, the trial justice nonetheless ruled that such evidence was prejudicial and had "no probative value whatsoever." It is significant that the record does not contain any offer of proof as to what knowledge Mr. Susana might have had about defendant's knowledge of the decedent's alleged prior incarceration. *See generally State v. Thornton*, 800 A.2d 1016, 1040 (R.I.2002). The defendant's brief indicates that defense counsel became aware of the decedent's criminal record from the witness statement of the decedent's sister. However, it is clear from the record of the colloquy between the trial justice and defense counsel that defense counsel did not point to any foundation for the possibility that Mr. Susana (the witness being cross-examined) might have knowledge regarding defendant's awareness of the decedent's alleged incarceration. *See generally State v. D'Alessio*, 848 A.2d 1118, 1124–26 (R.I.2004). We conclude that the trial justice did not abuse his discretion in this regard, and we therefore perceive no grounds for reversal with respect to the exclusion of evidence concerning the decedent's purported prior incarceration.

▮ Finally, we turn to defendant's argument that the trial justice erred in denying defendant's motion for a judgment of acquittal based on his theory that he was

---

**6.** We are in no sense disregarding our own recent observation that cross-examination is an important vehicle for permitting the factfinder to "observe and evaluate" the process of a witness being questioned and to consider the meaning behind the witness's words as revealed in body language and emotion.

*State v. Tiernan*, 941 A.2d 129, 133 (R.I.2008). We simply conclude that, in this instance, any possible error in barring one question in the course of defense counsel's cross-examination of Mr. Susana was harmless because the sought-after information did reach the jury through two other witnesses.

acting in self-defense during the altercation that resulted in the death of Mr. Graciano.

 Once a defendant has satisfied the burden of presenting sufficient evidence to raise the issue of whether he or she killed in self-defense, "it becomes the state's burden to disprove it beyond a reasonable doubt." *Hallenbeck*, 878 A.2d at 1012; *see also Infantolino v. State*, 414 A.2d 793, 797 (R.I.1980).

Rule 29 of the Rhode Island Superior Court Rules of Criminal Procedure provides in relevant part that the court "shall order the entry of judgment of acquittal * * * if the evidence is insufficient to sustain a conviction of such offense * * *." When he denied defendant's motion for a judgment of acquittal, the trial justice stated:

"[W]e know that there was some type of altercation between the two men where the defendant received two very, very superficial wounds to his hand, one on his palm and one to his right index finger. To the contrary, Mr. Graciano was stabbed some 17 times, four times in the back, and I find that any reasonable jury would find that Mr. Graciano suffered the key stab wound, one to his heart, while he was wearing a seat belt and the knife penetrated the webbing of the seat belt before plunging into the man's chest. Now, it seems to me that this struggle in the car went on for some time, so the issue becomes, was there intent to kill, and was there premeditation?"

Reviewing the record, it is clear to us, as it was to the trial justice, that the prosecution met its burden of presenting sufficient credible evidence that the defendant was the aggressor. When we view the evidence in the light most favorable to the prosecution, drawing all reasonable inferences consistent with guilt, we are convinced that the trial justice's ruling on this issue was supported by the evidence. *See Hallenbeck*, 878 A.2d at 1010.

### Conclusion

For the reasons delineated in this opinion, the defendant's appeal is denied and dismissed. The judgment appealed from is affirmed, and the papers in the case may be remanded to the Superior Court.