STATE

v.

Roy DIEFENDERFER.

No. 2006–189–C.A.

Supreme Court of Rhode Island.

May 8, 2009.

Christopher R. Bush, Department of the Attorney General, for Plaintiff.

Janice M. Weisfeld, Office of the Public Defender, for Defendant.

Present: WILLIAMS, C.J., GOLDBERG, FLAHERTY, SUTTELL, and ROBINSON, JJ.

## OPINION

Justice ROBINSON for the Court.

The legal issues that this appeal requires us to address arise in the context of a criminal plot that is as bizarre as it is troubling. The reader of this opinion may well wish to read it with pencil in hand in order to compose a sort of "cast of characters" that will facilitate an understanding of the plot and of the roles played by those who participated in it.

On May 25, 2005, following an eight-day trial, a Providence County Superior Court jury found defendant, Roy Diefenderfer, guilty of the following felonies: two counts of first-degree robbery, three counts of conspiracy to commit robbery, two counts of kidnapping, and one count of assault on a person over sixty years of age.

On appeal, defendant contends that the trial justice committed reversible error with respect to (1) his denial of defendant's request for a copy of a particular witness immunity order or a transcript of the underlying immunity proceeding; (2) his placing limitations on defense counsel's cross-examination of an alleged co-conspirator; (3) his permitting a witness to testify that he had pled guilty to having committed various crimes with defendant; (4) his admitting evidence of certain events that

occurred after the robberies at issue had taken place; (5) his admitting into evidence the cooperation agreement of another witness; and (6) his denial of defendant's motion for judgment of acquittal on the kidnapping counts.

For the reasons set forth in this opinion, we affirm the judgment of the Superior Court.

## Facts[1] and Travel

On April 25, 2002, two robberies took place at 1920 Mineral Spring Avenue in North Providence. At defendant's trial in May of 2005, the victims of the robberies as well as certain of defendant's alleged accomplices testified as to the details of the bizarre scheme that culminated in the April 25 robberies. That scheme involved establishing a fake jewelry store in a shopping plaza and arranging appointments with wholesale jewelry salesmen for the ostensible purpose of stocking the store, with the real purpose being to rob the unsuspecting salesmen upon their arrival. Two of the witnesses for the prosecution were defendant's alleged accomplices, Ms. Elaine Thomas and Mr. William Thomas,[2] both of whose testimony we shall now proceed to summarize; thereafter we shall summarize the pertinent testimony of certain other trial witnesses.

## I

### The Testimony of Elaine Thomas

Elaine testified at trial that she was involved in the April 25, 2002 robberies along with the following individuals: Roy Diefenderfer (defendant); Patty Diefenderfer (defendant's wife); William Thomas (Patty Diefenderfer's brother); and Michael Sparfven (the uncle of Patty Diefenderfer and William Thomas). She further testified that, in connection with the April 25 robberies, she entered into a cooperation agreement with the state and pled guilty to first-degree robbery, conspiracy to commit robbery, and larceny of a firearm. During defendant's trial, the prosecution elicited testimony from Elaine with respect to the cooperation agreement, and the agreement itself was read into the record.

Elaine testified at trial that she met defendant's wife, Patty Diefenderfer, through a neighbor and that the two became friends. She further testified that she met William Thomas through Patty (William's sister) and that they began dating in January of 2002. Elaine testified that she met Mr. Sparfven later in 2002, and he asked her whether she wanted to work with William in a boutique jewelry store.

Elaine testified that, after first having leased space for the self-styled jewelry store[3] at a location that was later deemed to be unsuitable, she was instructed by Mr. Sparfven to rent space at the 1920 Mineral Spring Avenue location and to do so under the alias "Joyce Silva." She testified that she leased the space at the Mineral Spring Avenue location approximately one month before the robberies.

---

1. The facts set forth in this opinion were adduced from the testimony of the multiple witnesses who testified at defendant's trial.

2. Although they have an identical surname, Elaine Thomas and William Thomas were not formally related to each other at any pertinent time (although they had begun dating shortly before the inauspicious robberies that gave rise to this case). For the sake of clarity, we shall hereinafter frequently refer to them by their first names. We intend no disrespect.

3. For the sake of conciseness, we refer to the Mineral Spring Avenue site of the robberies as a "jewelry store." It was, of course, no such thing; it was rather a sort of Potemkin Village designed to facilitate the commission of several serious felonies.

According to Elaine's trial testimony, at some point in the Spring of 2002 she realized that what was being set up was not a legitimate jewelry store. She testified that, around that same time, Mr. Sparfven outlined for her the scenario of the planned robberies and explained what her role would be with respect to same (*viz.*, to greet the jewelry salesmen when they arrived and then to lead them from the front of the store to a back room). She further testified that, during that same period, William asked defendant to participate in the robberies, for which participation he was to receive $1,000. Elaine testified that defendant's role in the robberies was to remain in the back room of the jewelry store with William while they awaited the moment when they would "beat up" and rob the jewelry salesmen.

Elaine testified that it was Patty Diefenderfer who gave her the materials that Elaine was to use in dressing in disguise prior to greeting the jewelry salesmen.[4] She further testified that, on the day when the planned robberies actually took place (April 25, 2002), she put on her disguise, drove with William to defendant's home, and then left for the jewelry store with defendant after switching into another vehicle. Elaine testified that it was defendant's idea to switch vehicles and take his grandfather's vehicle to the jewelry store.

Elaine testified that the jewelry salesmen were scheduled to arrive at the store between noon and two o'clock in the afternoon of April 25. She further testified

that, prior to the time when the jewelry salesmen were scheduled to arrive, she went into the back room where defendant and William were waiting, and she noted that they were wearing baseball hats and had covered their faces with black pantyhose.[5]

According to Elaine, after the robberies took place she and her cohorts drove, in two separate vehicles, from the jewelry store to Mr. Sparfven's office. She said that, once they arrived there, Mr. Sparfven gave defendant $500; she added that William also received money from Mr. Sparfven. Elaine further testified that she saw William give defendant another $500. Elaine said that, after this meeting, William and defendant drove with her to defendant's house in order to drop off defendant and retrieve William's vehicle.

Elaine next testified that she and William went to Massachusetts after the robberies. She testified that they stayed in various hotels throughout Southeastern Massachusetts and in the Boston area until their arrest on May 23, 2002. Elaine testified that, during that April and May period in which they were staying in various hotels, she and William remained in contact with and received money from Mr. Sparfven, which money was delivered to them by Patty Diefenderfer.

## II

### The Testimony of William Thomas

William Thomas testified with reluctance at the trial of defendant, Roy Diefenderfer.

---

4. Elaine testified that Patty Diefenderfer gave her the following materials that were to be used when she dressed in disguise: a black and white checkered maternity dress, a pillow to be inserted inside the dress, and a size forty bra that was to be stuffed with toilet paper. Elaine was to employ those items in order to make herself appear pregnant and thereby different from her usual appearance. She further testified that, on the day of the robber-

ies, she pulled her hair into a tight bun, wore fake eyelashes, and applied bronzing liquid to her face in order to make her complexion appear darker.

5. Elaine also testified as to the details of the two robberies that were actually committed that afternoon; several of those details will be discussed later in this opinion.

At an early point in the prosecutor's questioning, William invoked his Fifth Amendment privilege against self-incrimination, saying that he refused to testify because he didn't want to "implicate [himself] anymore." After William invoked his privilege against self-incrimination, the prosecutor asked for and was granted a recess so that he could file a petition seeking an immunity hearing before the presiding justice of the Superior Court. An immunity hearing was held the following morning, and the presiding justice granted William immunity with respect to his testimony at defendant's trial, ruling that William's testimony was "necessary and material."[6]

When defendant's criminal trial resumed, the prosecutor summarized on the record what had occurred at the immunity hearing.[7] He stated that the presiding justice, before granting immunity to William, had informed him that, if he failed to answer questions at defendant's trial after being granted immunity, several actions could be taken against him. The prosecutor added that the presiding justice had warned William that, if he failed to answer questions and was found in contempt, such a finding of contempt could be the basis for a ruling that he was in violation of the conditions of his probation and could potentially result in his being ordered to serve additional time on his suspended sentence.[8] The prosecutor further reported, and the attorney who represented William at the immunity hearing confirmed, that William had been given an opportunity to consult with his lawyer both privately and in court during the course of the immunity proceedings. William's attorney further explained that the presiding justice had indicated that the "matter could not be used against him in any Rhode Island jurisdiction, any foreign jurisdiction, state or federal."

After the prosecutor had made the above-summarized representations in open court, defendant's attorney requested that he be given in writing "any promises, rewards and inducements, any exculpatory evidence * * * concerning any conversations [which the prosecutor has] had with this potential witness."[9] The defendant's attorney further requested the following: (1) a transcript of the immunity hearing proceedings or a signed copy of the immunity agreement; and (2) a written statement from the prosecutor setting forth both the number of times that the prosecutor met with William and the nature of what was said in any such meeting.

In response, the prosecutor orally asserted that there would be no exculpatory evidence relating to defendant in William's proposed testimony. The prosecutor further asserted that the testimony to be elicited from William at defendant's trial would be limited substantively so as to consist solely of the facts surrounding the charges to which William had already pled guilty in September of 2003; he added that

---

6. William was represented by counsel at the immunity hearing before the presiding justice.

7. The appellate record in the instant case contains a transcript of the immunity hearing before the presiding justice.

8. According to the prosecutor, the presiding justice further explained to William that a finding of such a probation violation could result in a judge sentencing him to the remaining fifteen years of his suspended sentence or some lesser portion thereof.

9. The defendant's attorney sought this information in reliance upon Rule 16 of the Superior Court Rules of Criminal Procedure, which (in conjunction with the principles set forth in the United States Supreme Court's 1963 opinion in *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963)) requires disclosure of all exculpatory evidence.

a summary of this expected testimony had been provided to defense counsel over one year previously.[10] In addition, the prosecutor stated that William had been given no promise, reward, or inducement for testifying at defendant's trial.[11] He further explained that he had met with William in the cellblock to inform him (1) that the state had subpoenaed him to testify; (2) that he had the right to invoke his Fifth Amendment privilege against self-incrimination; and (3) that, if he did so, the state would petition the court to grant him immunity.

After the prosecutor had made the just-summarized representations, defense counsel again requested that he be provided with a copy of the transcript of the immunity hearing. The trial justice stated that defense counsel already had a transcript of William's plea proceeding, and he found that the state had "lived up to its obligation."

William then proceeded to testify that he had pled guilty to robbery, conspiracy to commit robbery, larceny of a firearm, kidnapping, and assault on a person over sixty years of age. He testified that he had received a sentence of ten years to serve. In questioning William about each count, the prosecutor asked him if he had pled guilty to committing the charged crimes "with Michael Sparfven, Roy Diefenderfer, and Patricia Diefenderfer." De-

fense counsel objected to "the form of the question" with respect to most of these questions concerning the counts to which William had pled guilty. Those objections were overruled.

During his testimony, William corroborated many of the details of the robberies concerning which Elaine had already testified.[12] William testified that it was just four days before the robberies took place that he first learned of the robbery scheme and of the fact that they were not opening a legitimate jewelry store. He further testified that defendant became involved in the robbery scheme two days before the April 25 date when the robberies were scheduled to occur. He further testified as to his belief that Mr. Sparfven had planned the robberies because he needed money to make payments on mortgages that he had taken out on the homes of two relatives.[13] William testified at trial that, although he was at first reluctant, it was because of these mortgages and the offer of a payment of $1,500 that defendant agreed to participate in the robberies. He further testified that, before the day of the robberies, he assembled the following supplies: duct tape, zip strips, black nylon stockings, and pepper spray.

William testified at trial that, on the day of the robberies, he and defendant were to be stationed in the back room of the jewelry store; the plan was that, when the

---

10. The prosecutor explained that, at the time of William's guilty plea, he never gave a statement to the police and never entered into a cooperation agreement with the state. According to the prosecutor, the only promise William received was that the prosecutor agreed to a "cap" on his sentence—*viz.*, twelve years to serve.

11. During his trial testimony, William testified that he had not entered into a cooperation agreement with the state at the time he pled guilty, that neither the prosecutor nor anyone else from the Attorney General's office had made him any promises in exchange for

his testimony, and that before his testimony at trial he had not been promised anything by the state.

12. See footnote 5, *supra.*

13. William testified that one of the mortgages that Mr. Sparfven had taken out was on the home of William's mother (who, it will be recalled, was also defendant's mother-in-law). William further testified that the other mortgage was taken out on the home of his grandmother (who was also the grandmother of defendant's wife, Patty Diefenderfer).

jewelry salesmen were led to the back room, he and defendant would separate them from their wares and then put the victims into a small closet. His testimony at defendant's trial detailed that he and defendant substantially comported with this plan. He testified that appointments had been made with four different jewelry salesmen for them to come to the jewelry store on the day of the robberies, but that only three actually showed up.[14] His testimony as to the post-robbery flight to Massachusetts with Elaine and their eventual arrest was consistent with Elaine's trial testimony.

During the cross-examination of William, defense counsel attempted to question him about criminal activities in which he had allegedly participated with Mr. Sparfven in Florida and Pennsylvania. The trial justice sustained the prosecutor's objections to that line of questioning and refused to hear defense counsel at sidebar, saying that the issue constituted "a collateral matter." The trial justice did nonetheless permit William to testify that he had been in the "presence" of Mr. Sparfven and a man named Kevin in Florida.[15]

### III

### The Testimony of the Robbery Victims

#### A

### The Testimony of James [16]

The first jewelry salesman to enter the jewelry store, James, testified at defen-dant's trial that, at some point in April of 2002, he was contacted by a man who called himself Dan Matos. Mr. Matos informed James that he would be opening his own jewelry store, and he asked the salesman if he dealt in diamonds. James testified that he told Mr. Matos that he did not deal in diamonds; but, when he learned that Mr. Matos had some gold, he agreed to have it assayed [17] with a view towards possibly buying the gold from Mr. Matos. He further testified that, at some point before the day of the robberies, he went to the jewelry store to pick up the gold that was to be assayed. Although Mr. Matos was not present, he testified that a person who looked like a construction worker gave him the gold and signed a receipt for the gold as "William Thomas." [18]

James testified that he returned to the jewelry store at 1:15 pm on April 25 for a scheduled appointment; he said that he brought with him approximately $7,000 in cash so that he could purchase additional gold. He testified that, when he arrived at the store, he was met by a woman whom he later identified as Elaine. He further testified that Elaine led him to a door down a hall and that, as he entered the doorway, he was ambushed by two men. He testified that one of the men sprayed mace in his face. James testified that, after being pulled to the floor by his assail-

---

14. According to William's trial testimony, Mr. Sparfven, using the pseudonym "Dan Matos," had scheduled the appointments with the jewelry salesmen.

15. Elaine testified earlier in the trial that she had heard from William that he and a man named Kevin had previously joined with Mr. Sparfven in committing a robbery in Florida.

16. We shall refer to the victims pseudonymously throughout this opinion in order to protect their privacy.

17. James testified that assaying gold is the process by which the purity of gold is determined. *Webster's Third New International Dictionary of the English Language* 130 (3rd ed. 1961) defines the noun "assay" as meaning "a chemical test to determine the presence or absence of one or more components of a material * * *."

18. James later identified William from a photo array as the man who gave him the gold.

ants, he was "hogtied" with his hands being bound to his feet behind his back and that he was then dragged into a smaller room.[19] James also testified that he did not remember many of the details about his attackers, but he stated that he did know that the two men who attacked him took the $7,000 which he had brought for the purpose of purchasing gold from Mr. Matos.

James further testified that, while confined in the "small room" with his hands and legs bound and his mouth covered with duct tape, he heard another man arrive outside the door and heard the sounds of a violent "scuffle." James testified that, minutes later, a man (who was also bound) was put into the room. James further testified that he had a small pocket knife on his belt, which he used to cut his own bindings and then to free the other man.

### B

### The Testimony of Howard

Howard was the second jewelry salesman to enter the self-styled jewelry store. He would become the second robbery victim and would join James in involuntary confinement in the small room. Howard testified at defendant's trial that, at some point in late March or early April of 2002, a man who introduced himself as Dan Matos had called him to inquire about buying jewelry for a new jewelry store. He testified that he arranged to meet Mr. Matos at the jewelry store several days before the robbery, but that, when he arrived

there, he was told by a "workman or contractor" that Mr. Matos was in Boston for the purpose of procuring a safe.[20]

Howard further testified that on April 25 he went to the jewelry store pursuant to another appointment that he had made with Dan Matos. He testified that he brought with him a shoulder bag and a case of jewelry samples valued at approximately $26,000. It was further his testimony that there was a handgun in his shoulder bag and that he had an additional $600 on his person. Howard testified that, upon his arrival, Elaine met him in the entry area and guided him to a door down the hall. He testified that he knocked on the door and was told to come in; he said that, as he proceeded through the doorway someone grabbed for his shoulder bag and pulled him into the room. Howard testified that he was sprayed with mace but that it did not affect him because he "was so blooming angry."

It was Howard's testimony that he was sixty-one years old at the time of the robberies. To his credit, however, the fact that he was not a young man did not prevent Howard from engaging in a violent struggle with his two attackers upon entering the back room. He testified that the struggle lasted about five minutes until he was finally forced to the floor and tied up. Howard testified that both of his assailants were wearing stocking masks and that one of the men was taller than the other and was "scruffy looking," whereas he described the other as being short and

---

**19.** In their trial testimony, the robbery victims described their place of confinement as a "small room." By contrast, both Elaine and William described the space where James and Howard were confined as a "closet." We infer from the entirety of the trial testimony that, despite the differences in terminology, the place of confinement described by the robbery victims and by those who perpetrated

the robberies was the same. We shall use the two terms interchangeably in narrating what occurred on April 25, 2002.

**20.** Howard later testified that he recognized William as being the "workman" with whom he had spoken on the day when he first visited the jewelry store and as one of the two men who attacked him on the day of the robberies.

rugged. He further testified that, after he was tied up, he was thrown into the closet with James. He added that his assailants took all of his valuables, including the handgun.

Howard testified that, while he was in the small room, he was able to work free of his bindings and then could watch his two assailants through a hole in the door. He further testified that he heard a man and woman [21] approaching the door leading to the back room of the jewelry store and decided that he would try to warn the approaching person to contact the police. He testified that he then bolted from the closet and that another violent struggle with the robbers ensued. Howard testified that he yelled "call the police" at least three times during the struggle but was not sure whether anyone heard him. According to Howard's trial testimony, the struggle ended when he was again tied up in the closet with duct tape being placed over his eyes, mouth, and nose. He further testified that, when he and James believed that their assailants had left the premises, James cut his own bindings with a knife that he had on his person and then proceeded to free him. Howard testified that he then left the premises and called the police from an insurance office located next to the jewelry store.

## C

### The Testimony of Michael

A third jewelry salesman, Michael, also testified at defendant's trial. He testified that he was contacted by a man who called himself Dan Matos; that man expressed interest in purchasing diamonds from Michael for a new jewelry store that Mr.

Matos said he would be opening on Mineral Spring Avenue in North Providence. Michael testified that he went to the jewelry store on two occasions. He first went there prior to the day of the robberies in order to meet with Mr. Matos. When he arrived at the store, however, he was met by a workman who told him that Mr. Matos was not available.

It was further Michael's testimony that the second time that he went to the store was on the day of the robberies (April 25, 2002). He testified that Mr. Matos had made an appointment with him, pursuant to which he was to come to the store between 1:00 and 1:30 in the afternoon on that day. Michael further testified that, on the designated day, he in fact went to the jewelry store and was met by a woman who "looked like a street lady." [22] He testified that the woman walked to the back of the store and purported to announce his arrival to Mr. Matos. Michael then testified that he heard noise and grunts of pain coming from the back room and that he questioned the woman about it. He said that the woman first told him that people were in the process of moving a hot water heater. He added that, after he expressed doubt about the woman's explanation, she went into the back room and then returned explaining that the people were actually moving a safe.

Michael testified that, after the woman had provided this second explanation, the phone rang and the woman reported that it was Mr. Matos calling to leave a message that he was delayed in traffic and would be late for the scheduled appointment. Michael testified that, his suspicions having been aroused after receiving

21. We can infer from the record (1) that the man whom Howard heard approaching the back room was the third jewelry salesman whom the conspirators planned to rob (*viz.,* Michael) and (2) that the woman was Elaine.

22. From a reading of the record in its entirety, it is clear that the woman referenced in the text is Elaine.

this message, he left the jewelry store. He further testified that, on the following day, he read a newspaper article about the robberies; and, believing that he had been present in the same store as was mentioned in the article, he immediately called the police.

## IV

### The Motion for Judgment of Acquittal

At the close of all the evidence, defense counsel filed a motion for judgment of acquittal with respect to the kidnapping charges. The judge denied the motion and rejected defense counsel's argument that defendant's activity in restraining the salesmen was incidental to the robbery and therefore could not support separate kidnapping charges. The trial justice noted that there was sufficient evidence for a jury to conclude that the victims had been secretly confined in the closet, and he concluded that a jury could reasonably find that the actions described in the trial testimony constituted kidnapping.

On May 25, 2005, the jury found defendant guilty of the following charges: two counts of first-degree robbery, three counts of conspiracy to commit robbery, two counts of kidnapping, and one count of assault on a person over sixty years of age.[23]

Subsequently, on October 5, 2005, defendant received the following sentences (all to run concurrently): (1) thirty years (with fifteen to serve) on each of the two first-degree robbery convictions; (2) ten years to serve for each conspiracy conviction; (3) twenty years (with ten to serve) for each

kidnapping conviction; and (4) five years to serve for the assault conviction. A judgment of conviction was entered on October 24, 2005.

A notice of appeal was filed on defendant's behalf on October 6, 2005.[24] On appeal, defendant argues that the trial justice committed reversible error with respect to (1) his denial of defendant's request for a copy of William's immunity agreement or a transcript of the corresponding proceeding; (2) his limiting the extent of defense counsel's cross-examination of William; (3) his permitting William to testify about his guilty pleas to crimes committed with defendant; (4) his admitting evidence of certain events that occurred after the robberies; (5) his admitting into evidence Elaine's cooperation agreement; and (6) his denial of defendant's motion for judgment of acquittal on the kidnapping counts.

### Standards of Review

### I

### The Standard with Respect to the Rule 16 Issue

■ This Court affords great deference to a trial justice's decision with respect to whether or not a violation of Rule 16 of the Superior Court Rules of Criminal Procedure or *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), has occurred, and it "will not disturb that ruling on appeal unless he or she has committed clear error." *State v. McManus*, 941 A.2d 222, 229 (R.I.2008); *see also State v. Espinal*, 943 A.2d 1052, 1062 (R.I.2008) ("The standard of review applicable to a

---

**23.** The jury acquitted defendant of a single count of larceny of a firearm.

**24.** Although defendant's notice of appeal was premature, that fact does not deprive us of appellate jurisdiction. *See Brown v. State*, 964 A.2d 516, 526 n. 14 (R.I.2009) ("We

repeatedly have said that we treat premature appeals as timely filed."); *see also State v. Oliveira*, 961 A.2d 299, 306 n. 9 (R.I.2008); *State v. Rodriguez*, 917 A.2d 409, 413 n. 6 (R.I.2007); *State v. Hesford*, 900 A.2d 1194, 1197 n. 3 (R.I.2006).

trial justice's determination of whether or not there was a Rule 16 violation is extremely narrow: we will overturn a trial justice's ruling only if he or she has committed clear error."); *State v. Motyka*, 893 A.2d 267, 280 (R.I.2006); *State v. Briggs*, 886 A.2d 735, 755 (R.I.2005).

## II

### The Standard with Respect to the Cross–Examination Issue

■ It is certainly true that "a criminal defendant has a constitutional right to cross-examine prosecution witnesses * * *." *State v. Merida*, 960 A.2d 228, 234 (R.I.2008); *see also State v. Tiernan*, 941 A.2d 129, 133–34 (R.I.2008); *State v. Parillo*, 480 A.2d 1349, 1356–57 (R.I.1984). It is also true, however, that said right is not unlimited; it is subject to being "tempered by the dictates of practicality and judicial economy." *State v. Burke*, 574 A.2d 1217, 1222 (R.I.1990); *see also Merida*, 960 A.2d at 234; *State v. Lopez*, 943 A.2d 1035, 1042 (R.I.2008); *State v. Ramirez*, 936 A.2d 1254, 1261 (R.I.2007). A trial justice's exercise of discretion in limiting the scope of cross-examination will not be disturbed on appeal unless there has been a clear abuse of that discretion. *Merida*, 960 A.2d at 234; *see also State v. Silvia*, 898 A.2d 707, 715 (R.I.2006); *State v. Feole*, 748 A.2d 239, 242 (R.I.2000). At the same time, it must always be remembered that the "discretionary authority to limit cross-examination comes into play *only after* there has been permitted as a matter of right sufficient cross-examination to satisfy the Sixth Amendment." *State v. Freeman*, 473 A.2d 1149, 1153–54 (R.I.1984) (emphasis added) (internal brackets omitted); *see also Lopez*, 943 A.2d at 1042; *State v. Toole*, 640 A.2d 965, 976 (R.I.1994); *see generally United States v. Tracey*, 675 F.2d 433, 437 (1st Cir.1982) ("[T]he judge's discretionary limitation of cross-examination must be done with the utmost caution and solicitude for the defendant's Sixth Amendment rights.") (internal quotation marks omitted).

## III

### The Standard with Respect to the Admissibility of Evidence

■ "[Q]uestions pertaining to the admissibility *vel non* of evidence are confided to the sound discretion of the trial justice." *Merida*, 960 A.2d at 234. This Court has repeatedly held that it "will not disturb a trial justice's ruling on an evidentiary issue unless that ruling constitutes an abuse of the justice's discretion that prejudices the complaining party." *State v. Hallenbeck*, 878 A.2d 992, 1015 (R.I.2005) (internal quotation marks omitted); *State v. Gomez*, 848 A.2d 221, 232 (R.I.2004).

## IV

### The Standard for a Motion for Judgment of Acquittal

■ In reviewing a trial justice's denial of a defendant's motion for judgment of acquittal, this Court will employ the same standards as the trial court. *State v. Grant*, 946 A.2d 818, 826 (R.I.2008); *see also State v. Hesford*, 900 A.2d 1194, 1200 (R.I.2006); *State v. Briggs*, 886 A.2d at 760. In conducting our review, "[w]e view the evidence in the light most favorable to the prosecution, giving full credibility to its witnesses, and drawing all reasonable inferences consistent with guilt." *Grant*, 946 A.2d at 826. The motion must be denied if, when viewed in this light, the evidence "is sufficient to support a verdict of guilty beyond a reasonable doubt." *State v. Mondesir*, 891 A.2d 856, 861 (R.I. 2006).

## Analysis

### I

### The Issues Raised Concerning the Testimony of William Thomas

#### A

#### Defendant's Request for Copy of Immunity Order or Transcript of Hearing

 The defendant first argues that his due process rights were violated when the state failed to disclose all of the promises made to William in exchange for his testimony at defendant's trial. The defendant contends that he was entitled to receive a copy of the immunity hearing transcript or, at the very least, a copy of the immunity order; he adds that he was entitled to have same before defense counsel's cross-examination of William began.[25] In addition, defendant contends that, in the course of summarizing the immunity hearing in open court during defendant's trial, the prosecutor made no mention of the fact that William had been promised immunity in other jurisdictions as well as Rhode Island. Despite the prosecutor's in-court representation, defendant argues that it was the understanding of William's attorney and the presiding justice that such immunity was included in the subsequently entered immunity order. This, according to defendant, fell within the requirement that exculpatory evidence be disclosed and, therefore, entitles defendant to a new trial.

Although defendant did not expressly articulate his objection as falling within the parameters of *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), it is evident to us from both the record and defendant's submissions that the principles enunciated in that case lie at the core of his argument.[26] Accordingly, we will analyze his argument within the framework of *Brady* and Rule 16 of the Superior Court Rules of Criminal Procedure.

It should also be noted that the immunity order itself contained, in pertinent part, the following language:

"1. **WILLIAM THOMAS**, currently residing at the ACI, shall answer questions posed to him that relate to the robbery of several jewelry salesmen at issue in the above-referenced criminal trial.

"2. Such questions include those questions relating to the facts admitted to him under oath during his plea before Justice Dimitri, * * * and any derivative questions thereto.

"3. It is the opinion of the Attorney General that should **WILLIAM THOMAS** be compelled to answer questions related to this investigation, he shall not be incriminated in any other jurisdiction * * * *."[27]

---

25. Although defense counsel was not personally provided with a copy of the immunity order, such an order would have been readily available by requesting same from the clerk of the Superior Court.

26. It will be recalled that defense counsel, in addition to interposing an objection pursuant to Rule 16 of the Superior Court Rules of Criminal Procedure, also requested that he be given, in writing, "any promises, rewards and inducements, [and] any exculpatory evidence."

27. The second and third of the quoted paragraphs substantiate the prosecutor's assertions during the trial (and the state's position on appeal) that it was the Attorney General's opinion that William's testimony would be limited to the facts which were included in his plea colloquy—namely, to the crimes he had pled guilty to having committed in Rhode Island.

As an initial matter it should be noted that, nothing in the record indicates that William was promised anything in exchange for his testimony at defendant's trial. The prosecutor so stated in open court at defendant's trial. Following the immunity hearing before the presiding justice, the prosecutor returned to the courtroom where defendant's trial was being held and made the following representations in open court:

> "With respect to promises, rewards, or inducements, there are none offered to this witness. At the time he pled guilty, he never gave a statement to the police and he never entered into a cooperation agreement with the State of Rhode Island. He pled guilty and the only promise made to him was that received from the Court to the defendant [William] himself saying he would get no more than twelve years to serve. * * * The State never promised him anything, aside from the fact I would agree to a cap of twelve years to serve * * *. There is no promise, reward, or inducement to get him to testify today."

William also testified at defendant's trial, both on direct and while being cross-examined by defense counsel, that he had received no promises, rewards, or inducements in exchange for his testimony at defendant's trial. During the prosecutor's direct examination of William, the following exchange occurred:

"**Prosecutor:** Did you ever agree to help the State at the time you pled guilty?

"**William:** No, I did not.

"**Prosecutor:** I never made you any promises, right?

"**William:** No

"**Prosecutor:** And no one else from the Attorney General's Office has either?

"**William:** No, sir.

"**Prosecutor:** And before your testimony today, have I ever promised you anything in exchange for your testimony?

"**William:** No.

" * * *

"**Prosecutor:** * * * And is it fair to say that at the time you pled guilty, the Court told you that the only promise being made to you is that if you plead guilty, you would receive no more than twelve years to serve in the ACI * * *?

"**William:** Yes"

The prosecutor raised a hearsay objection to defense counsel's questioning of William about what had taken place at the immunity hearing.[28] The trial justice overruled the prosecutor's hearsay objection. Although he was not barred from doing so, at no point did defense counsel ask William about his subjective understanding of the immunity proceedings and the resultant immunity order.

It is also clear from the record that the prosecutor's summary of the immunity hearing and his summary of the presiding

---

**28.** At a sidebar conference concerning the state's objection, the prosecutor made it clear that his objection to defense counsel's line of questioning was to the manner in which the questions were being phrased. The prosecutor contended that defense counsel "is basically recreating what happened outside the presence of the jury in front of the jury with my hearsay remarks." The prosecutor specifically said during that sidebar conference: "If [defense counsel] wants to know what the witness thought this morning [at the immunity hearing], just ask him." It is clear that William's subjective understanding of the immunity proceedings and the immunity order was fair game for exploration by defense counsel. *See generally United States v. Onori*, 535 F.2d 938, 945 (5th Cir.1976) ("What tells, of course, is not the actual existence of a deal but the witness' belief or disbelief that a deal exists.").

justice's comments from the bench at the time that he granted immunity to William with respect to his anticipated trial testimony provided defendant with the information that he would need to be able to conduct a meaningful cross-examination of William with respect to the grant of immunity. The attorney who represented him at the immunity proceeding stated on the record at defendant's trial that it was his understanding that the immunity granted to William would extend to other jurisdictions. Therefore, defendant cannot now convincingly argue that his attorney had not been provided with sufficient information in order to be able to cross-examine William meaningfully with respect to how he understood the grant of immunity.

Accordingly, we perceive no error in the trial justice's ruling that defendant was not entitled to receive a transcript of the immunity proceedings or have delivered to him a copy of the immunity order.

### B
### Restriction on Cross–Examination of William Thomas

The defendant further argues that the trial justice impermissibly restricted his attempts to cross-examine William as to his motive and bias for testifying at defendant's trial. The defendant contends that the trial justice should have permitted him to cross-examine William concerning (1) whether or not William had engaged in criminal conduct in other states and (2) whether or not William had discussed with the prosecutor his potential criminal liability in other states. The defendant argues that such questioning would reveal whether William was promised immunity for these crimes or whether William believed he had immunity for those crimes in exchange for his testimony at defendant's trial.

Both the Sixth Amendment to the United States Constitution and article 1, section 10, of the Rhode Island Constitution guarantee an accused the right to confront and cross-examine witnesses who testify against the accused at trial. *State v. Texter*, 594 A.2d 376, 377 (R.I.1991) ("[T]he right of the criminal defendant to cross-examine his accusers is a fundamental tenet of both our Federal and our State Constitutions."); *see also Tiernan*, 941 A.2d at 133 ("[T]he right of accused persons to confront the witnesses against them has ancient and venerable roots, and this Court has ardently protected this right."); *State v. Olsen*, 610 A.2d 1099, 1101 (R.I. 1992) ("Included in the right to confront witnesses is the fundamental right of the criminal defendant to cross-examine his or her accusers."); 5 John H. Wigmore, *Evidence in Trials at Common Law* § 1367 at 32 (Chadbourn rev. 1974) (describing cross-examination as being "beyond any doubt the greatest legal engine ever invented for the discovery of truth").

In describing the scope of the right of confrontation, we wrote as follows in *State v. Freeman*, 473 A.2d 1149 (R.I.1984):

> "Such a right may not be given or withheld at the discretion of the trial justice. The discretionary authority to limit cross-examination comes into play only after there has been permitted as a matter of right sufficient cross-examination to satisfy the Sixth Amendment." *Id.* at 1153–54 (internal quotation marks and brackets omitted).

While it is true that a defendant must be afforded "*sufficient* cross-examination as a matter of right,"[29] there are limitations

---

29. *See State v. Dorsey*, 783 A.2d 947, 950 (R.I.2001); *see also United States v. Tracey*, 675 F.2d 433, 437 (1st Cir.1982) ("Although the trial judge retains the traditional discre-

relative to the exercise of that right. *Parillo,* 480 A.2d at 1359; *see State v. Wright* 817 A.2d 600, 610 (R.I.2003) ("The scope of cross-examination is not unlimited and the questioning is subject to the sound discretion of the trial justice."); *see also Lopez,* 943 A.2d at 1042; *State v. DePina,* 810 A.2d 768, 776 (R.I.2002).[30]

The record does not support defendant's contention that the trial justice precluded him from cross-examining William about (1) whether or not there had been discussions between William and the prosecutor about William's possible criminal activity in other jurisdictions or (2) whether or not William hoped or expected the state to help him with respect to any criminal charges that might arise from such crimes.

■ During the cross-examination of William, defense counsel attempted to elicit testimony from him as to whether or not he had ever been involved in criminal activities with Mr. Sparfven or the man referred to as Kevin. The trial justice sustained the prosecutor's objection, and he did not permit William to testify about these specifics. However, the trial justice did permit defense counsel to pursue a line of questioning on cross-examination as to whether he had ever been in the presence of Kevin and Mr. Sparfven and whether he had ever worked for Mr. Sparfven. It is noteworthy that Elaine had testified earlier at defendant's trial that William had told her that he had been involved in criminal activity in Florida along with Mr. Sparfven and Kevin. *See* footnote 15, *supra.* Additionally, on cross-examination, defense counsel was permitted to ask whether any of the work William performed for Mr. Sparfven was of a criminal nature. Although William testified that he had never been involved in any criminal activity with Mr. Sparfven, the jury had already heard Elaine testify as to such criminal activity. Accordingly, any error that the trial justice may have made in limiting the scope of the defense counsel's cross-examination of William was harmless.

As discussed in the preceding section of this opinion, the prosecutor interposed no objection to defense counsel's cross-examination of William as to his subjective understanding of the immunity order. Defense counsel however never sought to question William as to his subjective understanding of the immunity agreement or the immunity proceedings before the presiding justice. In our judgment, the trial justice did not abuse his discretion by limiting, as he did, the scope of the cross-examination of William.

### C

### William Thomas's Testimony Concerning His Guilty Plea

■ The defendant next argues that the trial justice committed reversible error

tion to limit the scope of cross-examination, discretion in the area of bias evidence becomes operative only after the constitutionally required threshold level of inquiry has been afforded the defendant."); *see generally United States v. Hatch,* 514 F.3d 145, 157 (1st Cir.2008) ("[L]imitations on cross-examination should be scrutinized with the utmost caution and solicitude for the defendant's Sixth Amendment rights.") (internal quotation marks omitted).

30. For example, we have stated that "[i]rrelevant questions and lines of questioning that offer to produce no probative evidence need not be permitted by the trial justice and may be properly limited." *State v. Gasparico,* 694 A.2d 1204, 1208 (R.I.1997); *see also State v. Drew,* 919 A.2d 397, 412 (R.I.2007).

by permitting William to testify that he pled guilty to having committed certain crimes *with defendant*. It is defendant's contention that the trial justice clearly erred when he allowed the jury to hear that testimony because said testimony constituted improper substantive evidence of defendant's guilt on the basis of a co-conspirator's guilty plea; for this reason, defendant contends that a reversal is warranted.

■ It is a basic principle of our criminal law that "use of a coconspirator's guilty plea or conviction as substantive proof of a defendant's complicity is not admissible in evidence." *State v. Parente*, 460 A.2d 430, 434 (R.I.1983); *see also State v. Braxter*, 568 A.2d 311, 316 (R.I.1990); *see State v. Riendeau*, 448 A.2d 735, 738 (R.I.1982).

■ However, such evidence is admissible and is deemed not to be unduly prejudicial when it is "introduced to impeach a previously convicted defendant testifying in the trial of his codefendant." *Parente*, 460 A.2d at 434; *see also Riendeau*, 448 A.2d at 738. This Court's opinion in *Parente*, 460 A.2d at 435, quotes with approval the following passage from *United States v. Halbert*, 640 F.2d 1000, 1005 (9th Cir. 1981):

> "[W]hen the prosecution examines the codefendant as its witness in support of its case-in-chief, a question about the guilty plea is legitimate as the purpose is to support the reasonableness of the witness' claim to firsthand knowledge because of admitted participation in the very conduct which is relevant. The fact [that] a witness has formally admitted personal responsibility enhances the circumstances adding up to that witness' believability." (Brackets in original.)

■ At the same time, however, it should be emphasized that, when such evidence is introduced, the trial justice has "a paramount responsibility to instruct the jury on the limited evidentiary use of the guilty plea or conviction." *Parente*, 460 A.2d at 435.[31] As guidance for the trial courts, we would state that we consider it highly desirable that such a curative instruction should be given at the time that the jury is first exposed to the evidence as well as at the time of final jury instructions.

In the course of his direct examination of William, the prosecutor asked him whether he had pled guilty to robbery in the first degree "along with Roy Diefenderfer, Patricia Diefenderfer and Michael Sparfven." He then proceeded to question William with respect to the other counts to which he had pled guilty; and each time the prosecutor named Roy Diefenderfer, Patricia Diefenderfer, and Michael Sparfven as being the persons with whom William had committed the crimes in question. William answered these questions in the affirmative.

During the prosecutor's just-summarized extensive questioning of William with respect to his guilty pleas, defense counsel simply stated "objection" or "objection to the form of the question" when the questions were posed. The trial justice overruled those objections. At no point did defense counsel articulate with any specificity the contention that he now seeks to raise on appeal—namely, that it is improper for an alleged co-conspirator to testify that he pled guilty to committing various offenses with a defendant who is charged as a co-conspirator.

---

31. *See generally Halbert*, 640 F.2d at 1006 (holding that jury instructions must make it clear that evidence of a witness's own guilty plea may only be used to assess that witness's credibility and may *not* be considered as evidence of the guilt of the defendant on trial).

■■ It is well settled that, pursuant to our "raise-or-waive" rule, we do not consider issues at the appellate level which have not been properly presented to the trial court. *State v. Bido*, 941 A.2d 822, 828–29 (R.I.2008) ("It is well settled that a litigant cannot raise an objection or advance a new theory on appeal if it was not raised before the trial court."); *see also State v. Palmer*, 962 A.2d 758, 766 (R.I. 2009); *Merida*, 960 A.2d at 236; *State v. Forand*, 958 A.2d 134, 141 (R.I.2008).[32] It should be borne in mind that, in order to satisfy the strictures of our "raise-or-waive" rule, an evidentiary objection must be "sufficiently focused so as to call the trial justice's attention to the basis for said objection * * *." *State v. Warren*, 624 A.2d 841, 842 (R.I.1993); *see State v. Gautier*, 950 A.2d 400, 407 (R.I.2008) ("It is well settled that issues that were not preserved by a specific objection at trial, sufficiently focused so as to call the trial justice's attention to the basis for said objection, may not be considered on appeal.") (internal quotation marks omitted); *Toole*, 640 A.2d at 972–73 ("[I]ssues that were not preserved by a specific objection at trial, sufficiently focused so as to call

the trial justice's attention to the basis for said objection, may not be considered on appeal.") (internal quotation marks omitted); *see also State v. Flori*, 963 A.2d 932, 942 (R.I.2009); *State v. Day*, 925 A.2d 962, 979 (R.I.2007).[33]

When we look to the instant case and consider defense counsel's quite unspecific utterances ("objection" or "objection to the form of the question"), it is clear that the issue that defendant seeks to raise on appeal (*viz.*, the propriety of naming defendant as one of those with whom the testifying witness had conspired) has not been preserved. Quite simply, there was insufficient specificity at the trial court level.

## II

### Admissibility of Post–Robbery Evidence

■■ The defendant also argues that the trial justice erred in admitting evidence about the postrobbery flight of William and Elaine to various locations in Massachusetts and about the assistance that Patty Diefenderfer and Michael Sparfven provided to them during that flight.[34] The defendant argues that the

---

**32.** It is true that a narrow exception to our "raise-or-waive" rule exists where constitutional rights are concerned and certain specific conditions are present. *See, e.g., State v. Bido*, 941 A.2d 822, 828–29 (R.I.2008); *State v. Day*, 925 A.2d 962, 975 n. 20 (R.I.2007); *State v. Texter*, 896 A.2d 40, 43 (R.I.2006). It is clear, however, that the instant situation does not fall within the parameters of that exception.

**33.** There is nothing Kafkaesque or arbitrary about the requirement that evidentiary objections be sufficiently focused and specific. The purpose of the requirement is to afford trial justices and opposing counsel the opportunity to grapple in the first instance with particular arguments based on the law of evidence in the vital context of the then-ongoing trial. *See State v. Burke*, 522 A.2d 725, 731–32 (R.I. 1987).

**34.** Elaine Thomas, William Thomas, North Providence Police Sergeant Christopher Pelagio, and four Massachusetts hotel clerks all testified at trial concerning the post-robbery flight of Elaine and William to Massachusetts.

The hotel clerks testified concerning the individuals who rented rooms in the various hotels in which they worked. Their testimony indicated that various receipts for the rooms rented showed that they had been rented by either Patricia Diefenderfer or Michael Sparfven. One hotel clerk testified that she was able to identify Ms. Diefenderfer from a photo array as being the individual who rented rooms from her; and another clerk, from a different hotel, similarly identified Mr. Sparfven from a photo array. William's testimony, in pertinent part, corroborated Elaine's testimony as to their post-robbery flight to Massachusetts. Additionally, North Providence Police Sergeant Christopher Pelagio testified

crime of conspiracy to commit a criminal offense does not include subsequent actions taken to conceal said conspiracy and that, therefore, the evidence about the flight should have been deemed irrelevant (pursuant to Rules 401 and 402 of the Rhode Island Rules of Evidence) and inadmissible at his trial since he played no role in those particular activities.

The prosecutor first introduced evidence of the post-robbery activities of Elaine and William during his direct examination of Elaine. It is important to note that, although now on appeal it is defendant's contention that the admission of testimony pertaining to the post-robbery flight of William and Elaine should have been barred as being irrelevant, at trial, defense counsel did not object to the prosecution's questioning of Elaine about the post-robbery activities for quite some time. Elaine testified without objection that, after the robberies, she and William traveled by train to South Station in Boston. She testified that they then took a taxi from South Station and stayed in a hotel in Newton, Massachusetts. She further testified that she and William stayed in that hotel in Newton for a "couple of days" until they decided to go to the Dorchester area of Boston, where they stayed in another hotel and visited Elaine's grandmother. Defense counsel did not object to this testimony.

Defense counsel did not voice an objection to this line of questioning until the point in Elaine's testimony when she stated that she and William were told by Mr.

Sparfven to travel from the Dorchester area of Boston to Attleboro, Massachusetts. At that point, counsel invoked only the rule against hearsay; he made no objection on the ground that the subject testimony was irrelevant.

As we indicated in an earlier section of this opinion, under our "raise-or-waive" rule this Court will not consider issues at the appellate level which were not properly raised before the trial court. *Palmer*, 962 A.2d at 766; *see also Merida*, 960 A.2d at 236; *Forand*, 958 A.2d at 141. Accordingly, we conclude that defendant has waived the issue of whether or not this latter portion of Elaine's testimony was properly admitted into evidence.

## III

### The Cooperation Agreement of Elaine Thomas

The defendant next argues that the trial justice committed reversible error when he admitted into evidence (as a full documentary exhibit and through the prosecutor's reading the document verbatim during his questioning of Elaine) the cooperation agreement that Elaine had entered into with the state. The defendant specifically argues that the document constituted inadmissible hearsay and that none of the exceptions to the rule against hearsay were applicable.[35] In addition, defendant argues that allowing the cooperation agreement to be admitted as a full exhibit for the jury to refer to during deliberations was also prejudicial to his defense. Ac-

---

that the driver's license number listed on one of the room receipts matched the driver's license number of Mr. Sparfven.

**35.** The defendant asserts that the business records or public records exceptions recognized in Rule 803(6) and (8) of the Rhode Island Rules of Evidence do not apply because the document was made in anticipation

of litigation. The defendant further contends that the document does not fall within the "catch-all" hearsay exception that is set forth in Rule 803(24) because it does not have the required circumstantial guarantee of trustworthiness. The defendant also contends that the document is not admissible as a past recollection recorded under Rule 803(5).

cordingly, defendant argues, his conviction should for this reason be reversed.

 Rule 801(c) of the Rhode Island Rules of Evidence defines hearsay as, "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." On several occasions this Court has stated that "[i]t is axiomatic that an out-of-court statement is not hearsay unless it is offered for the truth of the matter asserted." *State v. Johnson*, 667 A.2d 523, 530 (R.I.1995); *see also State v. Crow*, 871 A.2d 930, 936 (R.I. 2005) (holding that the testimony of a police detective concerning a conversation he had with a second detective was not hearsay and was admissible to demonstrate how the police detective had become involved in the continuing investigation); *State v. Mann*, 889 A.2d 164, 166 (R.I. 2005) (holding that the statement of an employee that a cable had been cut which previously secured a stolen compactor was not hearsay because it was offered for the limited purpose of showing what prompted the witness to conduct an equipment inventory); *State v. Tatro*, 659 A.2d 106, 110 (R.I.1995) (holding that an out-of-court statement made by a defendant that her registration was in the glove compartment was not hearsay because the statement served to show what prompted the officer to open the glove compartment); *Wells v. Uvex Winter Optical, Inc.*, 635 A.2d 1188, 1193 (R.I.1994) (holding that a statement was not hearsay because it was offered not for its truth, but rather for the purpose of showing the effect that the statement had on a particular individual). An out-of-court statement not offered for the truth of the matter asserted may be admissible when offered for a limited purpose unless otherwise precluded by virtue of Rule 402 or 403 of the Rhode Island Rules of Evidence. *Mann*, 889 A.2d at 166–67 ("Out-of-court statements not offered for the truth of the matter asserted may be admissible for the limited purpose for which counsel offers them, barring relevancy or prejudicial concerns under Rules 402 and 403 of the Rhode Island Rules of Evidence, respectively.").

It is clear from the record that Elaine's cooperation agreement was not "offered in evidence to prove the truth of the matter asserted." Rule 801(c). The cooperation agreement was not offered as substantive proof that Elaine would be testifying truthfully. Rather, it was offered to establish the circumstances under which Elaine was testifying at defendant's trial—namely, that she had agreed to plead guilty to certain criminal charges and testify against defendant in exchange for, *inter alia*, a sentencing recommendation from the state. As such, the cooperation agreement did not constitute inadmissible hearsay.

Accordingly, we perceive no error in the trial justice's decision to (1) admit the document into evidence as an exhibit and (2) to permit the prosecutor to read from the document verbatim during his direct examination of Elaine. Although the trial record does not indicate the trial justice's reasoning for overruling defendant's hearsay objection, it is clear from the record as a whole that the admission of Elaine's cooperation agreement was relevant.

 The defendant further argues that admitting the cooperation agreement into evidence was extremely prejudicial because that evidence constituted a form of improper vouching by the state with respect to the credibility of Elaine and therefore constitutes reversible error. In *State v. Chakouian*, 537 A.2d 409, 412 (R.I.1988), this Court stated that "[o]ne means through which improper vouching may occur is by admission of plea agreements phrased in a manner that suggests that

the government has special knowledge that its witness is speaking the truth." Improper vouching can also occur "if the prosecution place[s] the prestige of the government behind the witness." *Id.* (internal quotation marks omitted) (brackets in original); *see also United States v. Roberts,* 618 F.2d 530, 533 (9th Cir.1980). However, we have expressly stated that the "mere statement in a plea agreement that a witness promises to speak 'truthfully' does not by itself constitute improper vouching." *Chakouian,* 537 A.2d at 412.[36] Additionally, improper vouching cannot be established solely on the basis of "a statement in a plea agreement that perjury charges will be brought if the defendant makes any false statement under oath * * *." *Id.*

The record indicates that Elaine testified that her cooperation agreement contained a statement that she agreed to testify truthfully and that, if she should fail to do so, such a failure would constitute a violation of the agreement that could be "considered by the prosecution when formulating a sentencing recommendation." The cooperation agreement itself contains language indicating that, if Elaine should provide false information at any judicial proceeding, she could be charged with perjury and could be subject to further imprisonment.

The just-summarized language in Elaine's cooperation agreement does not rise to the level of improper vouching as that concept has been described by this Court. In *Chakouian,* this Court quoted with approval the language of the Court of Appeals of Michigan concerning when reversible error would exist with respect to the admission of a plea agreement on the grounds of improper vouching. *Chakouian,* 537 A.2d at 412. The Michigan opinion from which this Court extensively quoted with approval in *Chakouian* was *People v. Buschard,* 109 Mich.App. 306, 311 N.W.2d 759 (1981), and we believe it appropriate once again to quote the same passage from that opinion that we quoted in *Chakouian:*

"Based upon the state and Federal decisions cited above, we cannot hold that any reference to a plea agreement containing a promise of truthfulness is in itself grounds for reversal. A more accurate statement of the law appears to be that, although such agreements should be admitted with great caution, admissibility of such an agreement is not necessarily error unless it is used by the prosecution to suggest that the government had some special knowledge, not known to the jury, that the witness was testifying truthfully." *Buschard,* 311 N.W.2d at 763–64.

An instance of the "special knowledge" to which the court in *Buschard* made reference was discussed in *Roberts,* 618 F.2d at 533. In that case, improper vouching was held to have occurred because, in addition to admitting a plea agreement requiring a witness to testify truthfully, in closing argument the prosecutor stated that, if the witness were to testify falsely, then "charges of first-degree murder would be reinstated, and he would stand a very good likelihood of going to the gas chamber." *Id.* The prosecutor in *Roberts* also directed the jury's attention to a police officer seated in the courtroom; the officer did not testify at the defendant's trial, but was present throughout the proceedings. The prosecutor in that case informed the jury that the police officer was

---

**36.** Quoting from the federal appellate case of *United States v. Leslie,* 759 F.2d 366, 378 (5th Cir.1985), this Court in *State v. Chakouian,* 537 A.2d 409, 412 (R.I.1988), observed that the promise by a party to a plea agreement that he or she will speak truthfully "is the same promise he or she makes when called as a witness at trial."

on a "mission * * * to sit and listen to the testimony" of the chief prosecution witness. *Id.* Nothing in the record of the present case rises to the level of what occurred in *Roberts.*

Accordingly, the mere statement in the cooperation agreement that Elaine would testify truthfully coupled with her acknowledgment that she could be charged with perjury if she failed to do so does not constitute impermissible vouching and certainly does not require reversal.

## IV

### Denial of Motion for Judgment of Acquittal on Kidnapping

■ The defendant's final argument on appeal is that the Superior Court erred in denying his motion for judgment of acquittal on the two kidnapping counts because, in his view, the kidnappings were incidental to and merged with the robbery charges.[37] The defendant argues that the confinement and the rather minimal asportation of the two jewelry salesmen was incidental to the commission of the robberies and therefore cannot constitute the separate offense of kidnapping.

The Rhode Island kidnapping statute, G.L.1956 § 11–26–1(a), provides, in pertinent part, as follows:

"Whoever, without lawful authority, forcibly or secretly confines or imprisons another person within this state against his or her will, or forcibly carries or sends another person out of this state, or forcibly seizes or confines or inveigles or kidnaps another person with intent either to cause him or her to be secretly confined or imprisoned within this state against his or her will * * * shall be guilty of a felony and, upon conviction, shall be punished by imprisonment for not more than twenty (20) years."

■ Under Rhode Island law, "confinements that are incidental to the commission of a crime are not punishable under § 11–26–1." *State v. Innis,* 433 A.2d 646, 655 (R.I.1981). For the confinement of another to fall within the reach of the kidnapping statute, the confinement must have some "independent significance." *Id.* Accordingly, the "movement of a victim during the course of a crime cannot be punished as a kidnapping unless such movement exceeds that necessary to facilitate the crime at hand." *Id.*; *see State v. Pablo,* 925 A.2d 894, 899 (R.I.2007); *State v. Taylor,* 562 A.2d 445, 457 (R.I.1989).

The salesman whom we have referred to as James testified that he was bound and confined in the closet for five or ten minutes.[38] The salesman referred to as How-

---

**37.** It is noteworthy that the argument defendant now advances on appeal differs from the argument advanced at the trial level in support of defendant's motion for judgment of acquittal. At the trial level, defendant argued that the kidnapping and assault counts should be dismissed on the grounds of double jeopardy as that concept is described in *Blockburger v. United States,* 284 U.S. 299, 304, 52 S.Ct. 180, 76 L.Ed. 306 (1932). On appeal, however, defendant contends that the rule articulated by this Court in *State v. Innis,* 433 A.2d 646, 655 (R.I.1981), should have been the basis for granting his motion for judgment of acquittal. Although the double jeopardy issue is not pressed on appeal, we take this opportunity to note that the trial justice properly

found that the crimes in question satisfied the standard in *Blockburger* since each offense required a proof of fact that the other did not. *See Day,* 925 A.2d at 977 ("[W]here a single act or transaction constitutes a violation of two distinct provisions of the criminal law, we must consider whether each provision requires proof of a fact which the other does not.") (internal quotation marks omitted).

**38.** In reviewing the record and the trial testimony as a whole, it appears that James was in fact confined for longer than five to ten minutes. James testified that he arrived at the jewelry store at 1:05 p.m. on the day of the robberies and was promptly escorted by

ard testified that he arrived at the jewelry store at 1:30 p.m. on the day of the robberies and was almost immediately escorted to the back room. Upon entering the room, he was attacked, bound and confined in the closet. Howard further testified that he thereafter freed himself, bolted from the closet, and again struggled with defendant and William. At the end of this struggle, he was again bound and confined in the closet with James. Howard testified that he believed the entire incident (from the time he was first attacked until he was able to finally escape from the closet and call the police) lasted between twenty and twenty-five minutes. When defendant and his co-conspirators left the jewelry store, the victims were left bound and confined in the closet.

The victims were not detained simply for the purpose of robbing them; it is very significant to us that they were not released once the robberies were complete. Confining these victims to a small closet and leaving them there was clearly a confinement that exceeds that which was necessary for the commission of the robberies. In our view, these deplorable confinements cannot be classified as having been merely incidental to the robberies. *See Pablo*, 925 A.2d at 900 (holding that the kidnapping had independent significance when the defendant moved and confined the victim to a concealed location in order to make it more difficult for the victim to escape and detection less likely); *State v. Lambert*, 463 A.2d 1333, 1340 (R.I.1983) (finding that the victim's confinement and move-

ment exceeded that which was necessary to facilitate the crimes of robbery and sexual assault). The defendant's actions in confining the victims to the closet exposed both victims to a greater harm than the robbery itself initially posed. This is especially true since both victims had been physically assaulted and sprayed with Mace. The defendant's actions made it significantly more difficult for the victims to escape thereby concealing his criminal activity for a time. *See, e.g., Pablo*, 925 A.2d at 900.

Viewing the trial evidence in the light most favorable to the prosecution and drawing all reasonable inferences consistent with guilt, we are satisfied that the trial justice did not err in denying the defendant's motion for judgment of acquittal on the kidnapping charge. The testimony of the various witnesses for the prosecution was more than sufficient to establish that the crimes had independent significance.

### Conclusion

For the reasons set forth in this opinion, we affirm the judgment of the Superior Court. The record may be remanded to the Superior Court.

---

Elaine to the back room. Howard testified that he arrived at the jewelry store at 1:30 p.m. on the day of the robbery and was also promptly brought to the back room. James remained bound and confined in the small room during both of the violent struggles engaged in by Howard with William and defendant. Accordingly, it appears that James was confined in the closet for longer than five to ten minutes.